75 N.J. Super. 305 (1962)
183 A.2d 130
WALTER A. BEERS, PLAINTIFF-APPELLANT,
v.
BOARD OF ADJUSTMENT OF THE TOWNSHIP OF WAYNE AND THE TOWNSHIP OF WAYNE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1961.
Preliminary Opinion Filed April 17, 1962.
Resubmitted June 13, 1962.
Decided July 5, 1962.
*306 Before Judges CONFORD, FREUND and LABRECQUE.
Mr. Walter A. Beers argued the cause for appellant (Mr. Robert E. Beers, attorney).
Mr. Peter J. Van Norde argued the cause for respondent, Township of Wayne.
Mr. Walter F. Hoffman argued the cause for respondent, Board of Adjustment of the Township of Wayne.
*307 The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an action in lieu of prerogative writs which as tried in the Law Division consisted of an attack upon the refusal of the Wayne Township Board of Adjustment to grant plaintiff a variance from the minimum residential lot size and frontage requirements of the zoning ordinance, and, alternatively, upon the reasonableness and constitutionality of those provisions as applied to plaintiff's property. Since 1955 plaintiff has owned a corner tract of land on which five bungalow-type dwellings were erected prior to 1930, before the zoning ordinance in question was adopted, which have been used as such ever since by tenants. Four of these structures front on Water Street and one on Island Street. Plaintiff sold these homes to their tenant-occupants on installment contracts, but when be delivered a deed to one of them by a description not according with any previously fixed lot lines he was informed by the board of assessors that "this is a subdivision and must be referred to the Planning Board for approval." That body upon consequent application refused plaintiff's request for approval of subdivision of the tract into five lots, one for each dwelling, on the ground "it does not meet present zoning requirements." Whereupon the unsuccessful application to the board of adjustment and the action in the Law Division. That court held for defendants.
On the original briefing and argument of the appeal before us the only issues debated were those mentioned above  error in the ruling of the board of adjustment and the invalidity of the zoning ordinance lot area and frontage requirements. On subsequent deliberation over the matter by the court, we concluded that the root problem here was the question of the statutory jurisdiction of the planning board over the matter in the particular circumstances presented, or, alternatively viewed, the reasonableness or validity of a denial of approval of subdivision of this fully developed tract of land, in the light of the exempted nonconforming use of the property insofar as the zoning ordinance is concerned. *308 We directed submission of affidavits bearing upon the facts in relation to these issues and supplemental briefs on these points. These have been filed and have received our further study. The additional facts so supplied are not disputed. Our conclusion, for the reasons hereinafter stated, is that plaintiff is legally free to make separate conveyances to vendees of these dwellings within suitable curtilages of land, without regard for the action of the planning board. This disposes of the controversy and renders the other issues in the case unnecessary of resolution. The more detailed references to the facts infra are partly taken from the supplemental affidavit submitted by plaintiff, which has not been disputed by defendants.
The properties in question are situated in a residence B district under the zoning ordinance wherein residential use is confined to single family dwellings. Minimum lot area and frontage requirements have from time to time been increased by zoning amendments since the first zoning ordinance, adopted in 1930, set the area and frontage requirements at 2500 square feet and 25 feet respectively. The structures here involved are conceded by defendants to have been built prior to that time. As of June 1, 1955, when plaintiff acquired title to these properties, and ever since, the said lot requirements were 15,000 square feet and 100 feet, respectively, subject to certain qualifications not here applicable.
The locus in quo is situated near the southerly end of a residential B zoning district pocket having approximate median dimensions of 2600 feet by 500 feet, lying lengthwise along the Pequannock River, which borders its westerly side. It is abutted along its easterly side by the Erie-Lackawanna Railroad, and beyond that, and also on its north and south ends, by districts zoned industrial. In other words, it is a small residential pocket surrounded by the river and industrial areas. A map in evidence (Ex. P-7) shows the existing lot and building development of the southerly two-thirds of the pocket, including the property *309 here in litigation. The evidence discussed hereinafter applies to the area shown on that map. The section is dominated by one north-south street, Fayette Avenue. Island Street runs from Fayette Avenue to the river, and Water Street is a dead-end street making a "T" intersection with Island Street near the river. All the lots on the westerly side of Fayette Avenue run down to the river.
About 85% of the land area in question is built up with small dwellings on lots averaging about 25 feet in width. It appears these were all built in the 1920's as recreation bungalows primarily for summer occupancy. Beginning during the housing shortage of the last war, however, they were converted to all-year occupancy by installation of heating plants and insulation. There is evidence that there has been a demand for this type of housing in the area, and we infer from the proofs that many if not most of these properties are now owner-occupied. Some 82 such structures are shown on the map, in several cases more than one on a lot (some on rear areas of 25-foot lots). The market values per house and lot appear to run from $10,000 down to $3,000. An expert witness for defendants conceded this was a "very highly built up area." He further stated: "this area can be and at some day in the very near future should be considered a blighted area and that all structures within that area be torn down and the area be redeveloped." There is occasional flooding from the river. No sanitary sewer system exists here, and the houses are all served by septic tanks. According to the health officer of the township, the water table and soil conditions are such as to preclude any further installations of septic tanks for new construction, and emergency plans are being prosecuted by the municipality for construction of a sanitary sewer system for the area. There have been no sewerage complaints by or on behalf of the municipality, however, as to any of plaintiff's houses. Three of them have individual septic tanks, two share another.
*310 The defendants expressly concede the fact that the buildings of the plaintiff are valid nonconforming uses and entitled to the status accorded such uses by the statute and the ordinance.
The entire general area under discussion was originally platted as shown by a "Map of Lots at Island Park, Mountainview, Passaic Co., N.J., owned by Victor Haviser," dated April 1919, approved by the municipal governing body, and filed in the office of the Register of Passaic County May 10, 1919. Most of the lots shown thereon are, as noted above, about 25 feet in width. Plaintiff's holding consists of all of original lot #27 (frontage 32.28 feet) and a portion of original lots #25, #23, #21 and #19 on said map (all with frontages of 25 feet), the rear segments of the latter lots, which back on Fayette Avenue, having been conveyed away long ago by a predecessor in title. All these lots fronted on Water Street. The irregular tract as a whole measures 132.28 feet on Water Street, 136.83 feet along Island Street, 127.13 feet on the northerly boundary and 81.69 feet on the easterly boundary.
Although the erection of the structures on plaintiff's property ignored the original 25-foot lot lines as filed, it is clear this was done to afford less crowding of the buildings. If erected within the original lot lines, five bungalows could have been built on the Water Street frontage. Instead, four were built on that frontage, affording more space between them, and one on the Island Street side fronting 35.66 feet on that street (lot width 33.13 feet), using the rear portion of the Water Street lots for that purpose. As now proposed by plaintiff to be subdivided to accommodate the five dwellings on separate lots in separate ownership, the parcels would have the following dimensions: (a) 32' x 94'; (b) 32.94' x 94'; (c) 27.53' x 94'; (d) 39.81' x 94' x 101.17'; (e) 33.13' x 94.87' x 35.66' x 81.69'. It is obvious that such subdivision would result in lots deficient in size and frontage under the present ordinance. Since, however, it is conceded that plaintiff *311 may continue the present use of the dwellings on the land as they stand, being nonconforming uses, the only practical difference between the result sanctioned by the Law Division, and defended before us by defendants, on the one hand, and the relief plaintiff seeks, on the other, is that the former relegates the dwellings now and for the foreseeable future to occupancy by tenants while the latter would permit them to be owned by their occupants.
According to testimony adduced in the Law Division, the properties sold by plaintiff have been improved by their contract-vendees since purchase. The occupants have painted, repaired roofs and redecorated, and some have replaced heating plants.
Within the area shown on Exhibit P-7 there are only two or three parcels of vacant land large enough to satisfy the ordinance requirements. A real estate expert testified that plots of 100' x 150' in the area would not be saleable for purposes of improvement with a "proper home on it that would go with a 100 by 150"; further: "I can't see where you can have such conditions as you have here on the small plots and expect a man to come in and buy a 100 by 150 lot and put up that type of home. You spend 15 or 16 thousand dollars for a house in a 5 thousand neighborhood, how are you going to get your money out of it?" These parcels of vacant land not now built on are unsuitable for building because low and swampy. No new homes have been built in the area for 30 years or more. The same witness said plaintiff's properties have had no septic tank problem since a catch basin was installed.
Plaintiff offered in evidence a number of photographs of his dwellings and of others in the area, with which they appear to compare favorably in general appearance. They are modest but not unattractive.
The health officer of the municipality testified for defendants as to flooding and sewerage problems which the general area had suffered during his five-year tenure of office. Applications for certain building permits in 1956 *312 and 1957 were rejected because the properties could not pass percolation tests for septic tanks required by the health ordinance. However, he has no health complaints on record as to plaintiff's buildings.
Harvey Moskowitz, associated with the planning firm which recently developed a master plan for the township, discussed it as a witness for defendants. He explained the rationale of his firm's recommendations for planning of areas having problems of deterioration as being to upgrade or rezone them for a different use, although consideration is also given to existing uses. Although general theory is that "the zoning ordinance itself implements the portions of the land-use plan that can safely or reasonably be expected to occur within the future five years," yet "there is no justification for freezing existing uses if the land use in the future should be developed for something else." On cross-examination, the witness did not know whether any property in the area here involved "could be developed in accordance with the present zoning requirements." In response to the question as to why his firm had recommended that the general area here involved should be zoned for 100 x 150 foot lots, he said, in essence, that since this was a blighted, substandard and overcrowded development, aggravated with problems of a high water table and consequent sewerage difficulties, there was "required a much larger lot than existed there now." Moreover, they wanted to "stabilize development in the area until such time as the municipality was ready to move in to eliminate some of the shacks."
Upon our original consideration of this appeal we entertained considerable doubt as to the reasonableness or validity of the application against plaintiff's property of the minimum lot size and frontage requirements of this ordinance in view of the obviously incompatible character of the existing use-development not only of plaintiff's property, but of the entire surrounding area. See Zampieri v. River Vale Tp., 29 N.J. 599 (1959). But this question is not *313 reached if it is concluded, as we do, that the subdivision authority of the planning board does not extend to proscription of plaintiff's proposed conveyances of these residences in the circumstances here obtaining.
While we do not find it necessary to deal with the question whether the subdivision jurisdiction of a planning board can under any circumstances extend to an already fully improved parcel of land, cf. Smilow v. Orange Planning Board, 58 N.J. Super. 108 (App. Div. 1959) (precluding resort to subdivision to validate illegal extension of nonconforming use); Ardolino v. Florham Park Board of Adjustment, 24 N.J. 94 (1957) (where one of three lots sought to be realigned was vacant), there is a plenitude of recent authoritative opinion that the basic motivating objective of the subdivision control provisions of the Municipal Planning Act (1953) is to prevent deleterious future development of vacant land. The most recent relevant expression of the Supreme Court is found in Levin v. Livingston Tp., 35 N.J. 500, 506 (1961), where Mr. Justice Hall stated:
"Subdivision control, like zoning, is a tool of overall community planning. They are `closely related * * * in that both are preventive measures intended to avert community blight and deterioration by requiring that new development proceed in defined ways and according to prescribed standards. Zoning relates to the type of building development which can take place on the land; subdivision control relates to the way in which the land is divided and made ready for building development.' Cunningham, `Control of Land Use in New Jersey Under The 1953 Planning Statutes,' 15 Rutgers L. Rev. 1, 45-46, n. 175 (1960)." (Emphasis supplied)
In Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, 28 N.J. 423 (1958), the court felt impelled to discuss, although it did not there have to decide, the question whether at any given stage of development or conveyance-out of portions of a tract prior to adoption of the 1953 act the subdivision controls of the latter were inoperative *314 by reason of the fruition of vested rights of the property owner. It said (at p. 439):
"Thus, at least where virgin lands are concerned, the Planning Act of 1953 is applicable to instances where a plat plan of the tract had previously been approved and filed pursuant to the Old Map Act. But a problem emerges with respect to situations where the owner of a filed plat plan under the Old Map Act has taken additional steps other than merely filing the plat plan. Where, for instance, there have been conveyances of lots, developed or undeveloped, to individual owners pursuant to the filed plan vested rights in the nature of nonconforming uses may be created. Cf. Rodee v. Lee, supra [14 N.J. Super. 188 (Law Div. 1951)]. The resulting problem is to determine under what circumstances a tract may be classified as undeveloped and hence to require the exercise of planning powers." (Emphasis supplied)
and also (pp. 439-440):
"What may be appropriate regulation where a small virgin tract is subdivided into a small number of lots may not be appropriate where a small tract is carved out of a larger tract for purposes of further subdivision, where the larger tract has already assumed certain characteristics. The question of the applicability of the Planning Act of 1953 to situations where further action occurred, other than the mere filing of a plat plan under the Old Map Act, is one which is in need of legislative clarification. It is worthy of note that the two reports of the State Planning Commission, previously referred to, classified undeveloped subdivided lands into two categories, i.e., those tracts which were totally unoccupied and those which were sparsely occupied, the latter being defined as tracts containing one to five houses per block." (Emphasis supplied)
These expressions, as well as the source materials for interpretation of the subdivision control provisions of the Planning Act cited therein, make it evident that the Legislature did not envisage that particular legislation as a substitute for the use-zoning functions of the municipal governing body or board of adjustment but as a complementary land-development control technique, prophylactic in nature and purpose. Most pertinently for present purposes, there is no evidence that subdivision control authority was conceived by the Legislature as an antidote *315 against the sometimes unpalatable consequences of the protection of nonconforming uses under the zoning act. R.S. 40:55-48. As a court, we have no right to apply in advance of enactment the policy behind recently proposed legislation calling for the mandatory abatement of nonconforming uses within a given period of time. Yet one senses some such attitude underlying the reaction of the municipal authorities to plaintiff's attempt to sell off his properties separately. And see Grundlehner v. Dangler, 29 N.J. 256, 263 (1959).
Defendants' supplemental brief undertakes to defend the assumption of subdivision jurisdiction by the planning board in the instant situation on the ground that police power regulations (presumably health, sewerage and the like) can be enforced more easily against a single owner of the five buildings than against separate owners of each. First, we see no factual merit in the premise. Even as to the two bungalows which share one septic tank, the authorities can clearly visit sanctions for violation of any applicable ordinance upon two separate owners as effectively as against one joint owner. Second, and more to the point, nothing in the Planning Act remotely indicates that a planning board may deny approval of a subdivision for the purpose of preventing separate ownership of dwelling units in order to secure the supposed better enforcement of police power regulations. The mere statement of the hypothesis exposes its discordance with the whole idea of subdivision legislation and administration.
It may be noted that the planning board did not here condition approval of the requested subdivision upon specified ameliorative measures relative to drainage, sewerage or the like. Cf. Ardolino v. Florham Park Board of Adjustment, supra. The denial was outright, and merely because there "was no compliance with present zoning requirements" (presumably as to the dimensional specifications). Nor do defendants suggest a remand to the planning board for imposition of such conditions for approval.
*316 Denial of subdivision cannot practically or legally prevent the continued use of these structures for dwelling purposes, nor do defendants so contend. Such denial, moreover, obviously cannot effect salutary control over undesirable future development of the property so long as these buildings stand. When and if they are removed the statutory rights attendant upon the nonconforming use will automatically cease, and any reasonable zoning regulation may then properly be brought to bear upon the property. Moreover, in that event, the vacancy of the land will then legally justify appropriate subdivision controls. However, it is obvious that the problem of improvement of land use is here area-wide, not confined to plaintiff's single tract. Toward that end, various types of legislation to eliminate blighted areas are available to meet the problem on a comprehensive basis, with fair compensation to the property owners affected. See, e.g., N.J.S.A. 55:14A-1 et seq.; 55:14B-1 et seq.; N.J.S.A. 40:55-21.1 et seq. In the meantime, there is no impediment to adoption or enforcement of suitable police power regulations over the manner of use of these properties, whether or not they become owner-occupied.
There is another cogent consideration. We ought not lightly to indulge the notion that anything in the Planning Act was intended to undermine so fundamental a concept under the zoning statute as the principle of protection of nonconforming uses. The two pieces of legislation are cognate, and they should be applied consistently. Defendants do not even suggest, nor do we believe they properly could, that owner-occupation of a dwelling is a different use of the property in a zoning sense from tenant-occupation, the actual occupancy of the residence in either case being by a single family. As recently stated by this court, "The test [of nonconforming use] is `use' and not ownership or tenancy." Arkam Machine & Tool Co. v. Lyndhurst Tp., 73 N.J. Super. 528, 533 (App. Div. 1962). The combined effect of the actions of the municipal agencies *317 in this case, if approved, would in our judgment be to impair the statutory immunity of the nonconforming use of the property in question. Cf. Morris v. City of Los Angeles, 116 Cal. App.2d 856, 857, 254 P.2d 935 (D. Ct. App. 1953).
In a realistic sense, every point of disparity between the improved lots as demarcated by plaintiff's proposed conveyances and the regulations of the zoning ordinance are inherent in the long existing use and situation of the land and buildings. The mere drawing of appropriate lot lines between the structures to replace the old map lines which were ignored (to the advantage of the placement of the buildings) when they were erected, or to ratify for conveyance purposes the de facto lines of possession presumably intended as between the owner and the respective tenants during the tenancies, surely would not create substantial as distinguished from theoretical discrepancies with the zoning ordinance not existing before such new lines were drawn and before the zoning ordinance was adopted. The defendants' attitude towards plaintiff's program is seen actually to come down in essence to dictation of combined as against separate ownership of the dwellings. As indicated, we do not regard a mere change from tenant occupancy to owner occupancy as an extension or alteration of the previous nonconforming use of the dwellings. And there is no question as to the right of alienability of property along with its attendant valid nonconforming use. See Arkam Machine & Tool Co. v. Lyndhurst Tp., supra. Thus, any defense of the action of the planning board as supposedly preventive of violation of the zoning ordinance, within the theory of Smilow v. Orange Planning Board, supra, is illusory, and would but hide an attempt by indirection to impair the integrity of the legal nonconforming use by abolishing an integral incident of ownership in such use  unfettered alienability. Cf. the commentary on Smilow in Cunningham: "Control of *318 Land Use in New Jersey," XV Rut. L. Rev. 1, 47-49 (1960).
We add a word as to defendants' insistent theme that plaintiff bought the property in 1955 with knowledge of the zoning status of the property, thus bringing down upon his head the weight of the Spartan adage that having made his bed he should be made to lie in it. For whatever force that idea may legitimately have in a variance case where hardship is pleaded, it is irrelevant to either the construction of the Planning Act in the present context or the extent of the rights of an owner of a property with a nonconforming use. Even as to a variance case the rigor of the doctrine has been considerably softened. See Ardolino v. Florham Park Board of Adjustment, supra (particularly at 24 N.J., pp. 107-108). And note the persuasive attack upon the rationale of the rule in 1 Rathkopf, Law of Zoning and Planning (3d ed. 1960), c. 48, pp. 48-13 et seq.
For the reasons stated, we conclude and hold that plaintiff may as a matter of law convey these dwellings within suitable lot lines to his vendees without being in violation of the Planning Act or the planning or zoning ordinances of Wayne Township. We are cognizant that the planning board is not a party to this action. However, we regard the defendant township and its attorney in this case to have virtually represented it and deem the public interests involved adequately defended by that representation, particularly in view of the supplemental briefs. The interests of justice and of the expeditious determination of this controversy in entirety are best served by the making, in effect, of the declaratory judgment of the rights of plaintiff vis a vis the authorities of the municipality set forth in this determination. See Vacca v. Stika, 21 N.J. 471 (1956).
Judgment reversed; the cause is remanded for entry of judgment in conformity with this opinion; no costs.