695 A.2d 1238

STERLING HOMES CORPORATION,

v.

ANNE ARUNDEL COUNTY, Maryland.

No. 1620, Sept. Term, 1996.

Court of Special Appeals of Maryland.

June 27, 1997.

208

Stephen J. Nolan (Stuart A. Schadt and Nolan, Plumhoff & Williams, Chtd., on brief), Towson, for Appellant.

Robert M. Pollock, Sr., Assistant County Attorney (Phillip F. Scheibe, County Attorney, on brief), Annapolis, for Appellee.

Argued before MURPHY, C.J., and DAVIS, J., and THEODORE G. BLOOM, J. (Retired, Specially Assigned).

DAVIS, Judge.

On July 13, 1992, the Office of Planning and Zoning (OPZ) for Anne Arundel County refused to issue Sterling Homes Corporation (appellant) a permit to construct a marina bathhouse and parking lot (Bathhouse Permit) on three waterfront acres contiguous to a planned community called Stoney Beach. The proposed bathhouse and parking lot were to be followed by the completion of a commercial marina on the three acres. Appellant filed an appeal from this decision with the Anne Arundel County Board of Appeals (the Board) on August 10, 1992. After five days of testimony, the Board refused the permit, holding that OPZ properly denied the Bathhouse Permit and that comprehensive rezoning had occurred before

appellant was able to obtain a vested right in its proposed use of the site. Appellant appealed this decision of the Board to the Circuit Court for Anne Arundel County. On August 1, 1996, the circuit court (Robert H. Heller, J.) issued a thorough Memorandum Opinion and Order affirming the Board's decision. Appellant appeals from that judgment, presenting a single question for our review, which we rephrase:

Did the circuit court legally err in affirming the decision of the Board to deny appellant's permit application?

We hold that the circuit court committed no error.

## FACTS

In 1984, appellant, through its engineering firm, applied for approval to subdivide a sixty-acre parcel of waterfront property upon which it would construct the townhome community of Stoney Beach. At the time, fifty-seven acres of the land were zoned R15, a classification that permitted low-density multi-family dwellings. The remaining three acres were zoned MA2, which would allow a light-use commercial marina. The subdivision application consisted of sixteen plats; fifteen plats covered the R15 area (residential site), and the remaining plat covered the MA2 area (marina site). The preliminary plan showed 461 townhomes on the residential site. Plat sixteen, covering the marina site, contained a notation that it was a "Reserved Parcel—Zoned MA–2." It contained no details about a marina. It did contain a notation that "Any future construction with this Parcel will be subject to review and approved by the Office of Planning and Zoning." Likewise, neither a September 1985 traffic analysis report, nor the Chesapeake Bay Critical Area reports prepared by appellant in April 1985, mentioned a commercial marina on the site.[1]

---

1. The circuit court noted that a Critical Areas Report (CAR) dated April 24, 1995 mentioned a "potential marina," but did not specify a potential *commercial* marina, a significant difference within the Code.

ANNE ARUNDEL COUNTY CODE (A.A.C.C.), art. 28, § 1–110 distinguishes between a "commercial marina" and a "community marina":
§ 1–110. Same—"Marina".

The circuit court made reference, however, to a memorandum sent to OPZ on April 22, 1995, that stated that "a conceptual plan for the marina zone portion of the property [had] been prepared."

The County contended that, at the time of the initial subdivision application, appellant's plans for plat sixteen were unformed. Frank Ward, OPZ's project coordinator when the proposed subdivision was reviewed, testified at the Board hearing that "Reserved Parcel," in the context of the Anne Arundel County Code, "is a reference given to a property that is not approved for a building parcel in conjunction with a subdivision." According to Ward, such a notation is given in order that an unplanned parcel included within a subdivision application may have some type of designation, without indicating any future plans for the site. Ward explained, "[W]hen property is submitted for subdivision review, the entire property has to be shown in one form or another. We can't just leave a piece of the property hanging out there for lack of a better term." [2]

---

(a) In this article, "marina" means a facility, other than a private pier, that is located along the shoreline of the County and involves dry storage, wet storage, or docking of watercraft, and the following variations on the word "marina" have the meanings indicated.
(b) "Commercial marina" means a marina, other than a community marina, that provides services for public or private use.
(c) "Community marina" means a marina that:
　(1) is located on property leased or owned by a bona fide, nonprofit community association in the subdivision that the association represents; and
　(2) provides limited service in and for the subdivision, its residents, and their guests. . . .
　A revised CAR did not mention a proposed marina, but stated that there would be "a fishing pier and boat launching facility within the MA-1 [sic] area." This report included plans for a boardwalk, fishing pier, boat ramp, play area, and picnic pavilion.

**2.** The record does not indicate whether Ward based his opinion on the meaning of "Reserved Parcel" on a specific section of the Code; it appears that Ward was offering his interpretation of the policy followed by Anne Arundel County in designating parcels as "reserved." Ward distinguished a "reserved parcel" from a "reservation," which is defined in A.A.C.C. art. 26, § 1–101(44) as "the assignment by a subdivi-

David Thaler, an engineer, testified for appellant that the notation "reserved parcel" meant that the marina site was reserved for future MA2 use, which would include a commercial marina.[3] Sterling Leppo, appellant's president, testified that he understood the notation to mean that the marina site was reserved for a commercial marina use at some future date. Appellant also argues that, at the time of the review of the subdivision plans, Ward knew that appellant planned a commercial marina on plat sixteen. Ward testified that he told Ken Colbert, an engineer for appellant, to "either show a plan for the marina so we can include it in the subdivision, or set it up as a reserve parcel, which would defer submittal of any development plans on those areas until the developer knows exactly what he's going to do within that area." Ward also testified, however, to his recollection that Leppo intended to defer any action on the marina site until "some time in the future."

Appellant's final subdivision plats were approved by OPZ in November 1985, and recorded. Appellant then began construction of the community, which it maintains was to proceed in four phases. The first phase included the construction of the infrastructure for all portions of the property and the construction of some of the townhomes. The second and third phases included the construction of most of the homes in the middle of the property. According to appellant, the marina was to be completed during the last phase, when there would be sufficient financing and built-in demand from already occupied homes to complete it and the last 128 residences. At the time of final plat approval, appellant did not pay the fees required for commercial development and did not obtain a sewer and water allocation for the marina site.

---

der of land to be held by the subdivider to a future time for a specified use and no other use."

**3.** Thaler equated the notation "Reserved Parcel" with a "reservation" under A.A.C.C. art. 26, § 1–101(44), an equation Ward disputed as not reflecting County policy.

The OPZ refused to issue construction permits until appellant obtained all of the necessary public works agreements. Allegedly delayed by litigation over the ownership of the main access road to the property—ownership that appellee denied—appellant waited at least a year before obtaining a declaratory judgment in the circuit court that appellee owned the road. That judgment was issued in December 1986.

In November 1986, Anne Arundel County began the process of rezoning the entire county. In March 1987, the County released a map indicating the proposed zoning changes, including the proposed rezoning of appellant's property from R15/MA2 to R5, a less dense usage residential classification that, the Board and the circuit court stated, would support a community-owned marina (by special exception), but not a commercial marina. Appellant's counsel objected to the proposed rezoning in April and December 1988, and January 1989, to no avail. The Council passed the zoning ordinance on July 19, 1989, and gave final approval on July 28. The rezoning went into effect on September 11, 1989.

On March 20, 1987, two and one-half years before the rezoning went into effect, OPZ issued a grading and construction permit for appellant's property. The permit covered the entire sixty-acre property, including the marina portion, and allowed appellant to construct bulkheads and revetments along the shoreline to support the grading work. The circuit court accepted, *arguendo,* that appellant completed the following work before the effective date of the rezoning: construction of 1,600 lineal feet of bulkhead and 360 feet of waterfront revetment on the residential site, construction of sediment control devices and 120 feet of revetment on the marina site, completion of seventy-eight townhomes on the residential site, and road improvements and a sewer pumping station to service the development. In 1988, appellant also repaired existing pilings at the marina site, replaced deckboards and

stringers, and began leasing boating slips to the public.[4] Appellant also began marketing the development as a town-home community with a commercial marina. As part of this effort, appellant displayed a large drawing of the future marina in its sales office.

On April 14, 1989, appellant applied for a permit for additional grading on the marina site; on July 14, 1989, it applied for a building permit to build a bathhouse and a parking lot on the site (the Bathhouse Permit), the denial of which is the subject of this appeal. On July 28, the day the rezoning received final approval from the County Council, OPZ sent appellant a memorandum noting the legal impact of the zoning change, informing appellant that it could complete its residential development under the old R15 zoning, but that the marina site would be covered by the new zoning unless appellant obtained a permit and began substantial construction by the effective date of the rezoning.

Appellant argues that, at the time of the July 28 memorandum, it believed that it had applied for all the necessary permits. Appellant also maintains that, until the OPZ proposed the eventual downzoning, the County never indicated that any permits other than the Bathhouse Permit and the additional grading permit were needed to complete construction of the commercial marina. Appellee's position before the Board and the circuit court was informed by A.A.C.C. art. 28, §§ 5–110 and 5–111. These sections list the uses permitted as permitted uses and as special exception uses, respectively, in areas designated as MA2–Commercial Marina District. Neither bathhouses nor parking lots are listed as permitted principal uses in these sections. Article 28, § 10–106(d), governing accessory structures, states that an accessory structure may not be built without a principal structure. Thus, according to appellee, OPZ could not have issued the Bath-

---

4. Appellant does not indicate—and we are unable to find—how many slips were rented during this period. The Board noted that appellant did not obtain a use and occupancy permit and did not collect slip tax during this period.

house Permit alone; appellant first would have had to obtain a permit for a use permitted under § 5-110, such as piers.

On August 2, 1989, OPZ wrote to appellant that the marina site was not a legally subdivided lot and that appellant would have to go through the subdivision process in order to develop the site. Appellant assails this claim as an unfounded delaying tactic, deliberately calculated to prevent appellant from vesting its rights under the MA2 classification for the marina site before the rezoning took effect. Appellant claims that appellee admitted at the Board hearing that the lot had been legally subdivided all along. Nevertheless, appellant maintains that, in the time remaining before the rezoning took effect, it attempted to create a new administrative plat that would satisfy OPZ's requirements for a legally subdivided lot. It failed.

After the rezoning went into effect, appellant continued its efforts to construct the commercial marina while waiting for approval of the Bathhouse Permit. Appellant obtained various State and federal permits, completed and sold more townhomes, and made more improvements to the property. On July 13, 1992, three years after appellant applied, OPZ formally denied the Bathhouse Permit. Appellant appealed that decision to the Board.

The Board reviewed the permits for mass grading, bulkheading, and revetment completed under the grading permit that was issued, and found that these actions did not operate to advise the neighborhood as to the intended use of the MA2 tract as a commercial marina. Thus, appellant's rights under that use did not vest before the effective date of the rezoning. In addition, the Board denied the Bathhouse Permit as an improper application for an accessory use permit in the MA2 zone, made before appellant had obtained permits for a pier and boatslips.

The circuit court affirmed the Board's application of existing Maryland law, finding that substantial evidence existed to support the Board's finding that appellant's rights to develop the marina site had not vested before the rezoning. The court

also declined to adopt as Maryland law the New York decision of *Schoonmaker Homes–John Steinberg, Inc. v. Village of Maybrook*, 178 A.D.2d 722, 576 N.Y.S.2d 954 (1991), which stated that development rights to a parcel may vest if that parcel is part of a common scheme of development. Addressing appellant's argument that the Board failed to consider whether the County should be estopped from denying the permits, the court concluded that the evidence was insufficient to support a zoning estoppel claim.

## DISCUSSION

### Standard of Review

■ The decisions of an administrative agency will be affirmed on appeal if they are supported by substantial evidence and are not arbitrary, capricious, or unreasonable. *Supervisor of Assessments v. Peter & John Radio Fellowship, Inc.*, 274 Md. 353, 355, 335 A.2d 93 (1975). The definition of "substantial evidence" was discussed in *Board of County Comm'rs v. Oak Hill Farms, Inc.*, 232 Md. 274, 192 A.2d 761 (1963), in which the Court of Appeals stated that

substantial evidence [has] been held to mean more than a scintilla and ... such evidence "as a reasonable mind might accept as adequate to support a conclusion ... and enough to justify, if the trial were to a jury, a refusal to direct a verdict...."

*Id.* at 280, 192 A.2d 761 (quoted source omitted).

■ In addition, a zoning authority must properly construe the controlling law. *Umerley v. People's Counsel*, 108 Md.App. 497, 503, 672 A.2d 173, *cert. denied*, 342 Md. 584, 678 A.2d 1049 (1996). Our review is confined to whether 1) the agency recognized and applied the correct principles of law governing the case, 2) the agency's factual findings are supported by substantial evidence, and 3) the agency applied the law to the facts reasonably. *Evans v. Shore Communs.*, 112 Md.App. 284, 299, 685 A.2d 454 (1996). In our consideration of the last stage of analysis, we accord great deference to the agency and ask merely whether a reasoning mind could rea-

sonably have reached the conclusion reached by the agency. *Id.* Because we should not substitute our own judgment for the expertise of the agency from which the appeal is taken, *see O'Donnell v. Bassler,* 289 Md. 501, 509, 425 A.2d 1003 (1981), we may not uphold an agency's decision "unless it is sustainable on the agency's findings and for the reasons stated by the agency." *United Steelworkers of America, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62 (1984).

Finally, our analysis is informed by the following passage written by the Court of Appeals in *Pemberton v. Montgomery County,* 275 Md. 363, 367–68, 340 A.2d 240 (1975), as it reviewed a Board of Appeals determination that a permit was granted for a project, that substantial construction had begun under that permit, and that the construction was begun in good faith:

> Since these three questions, which are either clearly factual or at least mixed questions of law and fact, have been answered at the administrative level prior to this matter reaching the courts, our function, as was also true of the circuit court, is not to substitute our assessment of the facts for those of the Board as they relate to these issues, but merely to evaluate whether the evidence before the Board was "fairly debatable" such that a reasoning mind could reasonably have reached the same result as did the administrative agency upon a fair consideration of the factual picture painted by the entire record before that body.

## A

Appellant rests its argument entirely on the law of vested rights and does not challenge the Board's conclusion that the Bathhouse Permit, as an accessory use, could not have issued before a permit for a permitted use. We therefore do not review this finding by the Board, but confine our discussion to an analysis of whether appellant obtained vested rights to a commercial marina. MD. RULE 8–504(a).

The doctrine of vested rights is predicated on the legal theory that an owner who obtains a lawful permit, commences

to build in good faith, and completes substantial construction on the property, wins the right to complete the construction unaffected by a subsequent change in the zoning regulations. *Prince George's County v. Equitable Trust Co.*, 44 Md.App. 272, 278, 408 A.2d 737 (1979). In *Richmond Corp. v. Board of County Comm'rs*, 254 Md. 244, 255 A.2d 398 (1969), the Court of Appeals explained:

> In Maryland it is established that in order to obtain a "vested right" in the existing zoning use which will be constitutionally protected against a subsequent change in the zoning ordinance prohibiting or limiting that use, the owner must (1) obtain a permit or occupancy certificate where required by the applicable ordinance and (2) must proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being devoted to that use.

*Id.* at 255–56, 255 A.2d 398. This principle was restated in *Rockville Fuel & Feed Co. v. Gaithersburg*, 266 Md. 117, 291 A.2d 672 (1972), as follows:

> Such a "vested right" could only result when a lawful permit was obtained and the owner, in good faith, has proceeded with such construction under it as will advise the public that the owner has made a substantial beginning to construct the building and commit the use of the land to the permission granted.

*Id.* at 127, 291 A.2d 672; *Sykesville v. West Shore*, 110 Md.App. 300, 315, 677 A.2d 102 (1996).

We examine the Board's application of both prongs of the *Rockville Fuel* test to the facts of appellant's case.

## I

It is undisputed that appellant never obtained a permit for the construction of a commercial marina. Appellant also did not obtain a permit for the construction of additional piers and boatslips. The permits that appellant requested in 1989, the second marina grading permit and the Bathhouse Permit, were not granted. Nevertheless, appellant relies upon the

opinion of the Court of Appeals in *Pemberton* to argue that the initial grading permit issued on March 20, 1987 (grading permit) is sufficient to satisfy the first part of Maryland's vesting test.[5] That permit allowed appellant to construct initial grading of the entire sixty-acre property, and to construct revetments and bulkheading along the shoreline in both the R15 area and the MA2 area.

In *Pemberton*, the Court explained that the requirement of a valid permit should not be so narrowly construed as to require that a permit be issued for the final structure *per se*. In that case, the petitioner had applied for a special exception to construct a gasoline filling station. The county granted the special exception on the condition that the petitioner comply with MONTGOMERY COUNTY CODE § 111–32(c) (1955), which specified that permission to erect a building would be valid for one year, "during which time a building permit for such erection ... must be obtained and the erection ... started." *Pemberton*, 275 Md. at 366, 340 A.2d 240. On the last day of the twelve-month time period, the petitioner obtained a permit for the construction of a retaining wall, the first step in building the filling station. *Id.* at 367, 340 A.2d 240. In upholding the Board's decision that the retaining wall permit was a "building permit for such erection," the Court reasoned that

"a building permit" does not necessarily translate into a permit only for a building as such. Indeed, if a "building permit" for a swimming pool project, for instance, were required, the needed permit could be for the pool itself and not necessarily for a bathhouse building being erected near-by. And so, in this case, a "building permit" allowing commencement of a service station project can be a permit for the construction of a portion of that project such as the foundation or retaining wall and it is therefore not limited, as the appellant insists, to a permit for the erection of a

---

5. Appellant abandons any claim that any other permits it obtained satisfied the first part of the *Rockville Fuel* test. Consequently, we shall consider the March 20, 1987 mass grading and revetment permit only.

building; a gasoline station is, after all, probably more vitally comprised of the pumps and the underground storage tanks.

Furthermore, in the Board's view, "the retaining wall was an indispensable part of the support of the gasoline station building made necessary because the site slopes sharply to the rear of the lot," and, therefore, the retaining wall permit was part and parcel of the permit for building the station, it being inextricably connected to that erection.

*Id.* at 368–69, 340 A.2d 240. Ultimately, the Court deferred to the expertise of the Board, quoting from the Board's opinion:

"Since every building must begin with a foundation, common sense indicates that obtaining a permit to begin where one must begin, *i.e.*, with a foundation, is sufficient to satisfy the requirements of Section 111–32. The applicant [ (Exxon) ] would have had to start construction with the foundation regardless of the kind of building permit first obtained. A foundation permit is a building permit, since it is sufficient to allow the start of construction under the provisions of the code and under the practices of the office of Building Inspector and the construction industry."

This finding by the Board, as to the existence of a construction permit within the requisite twelve-month period, is based upon a foundation of evidence which is at least "fairly debatable," and, therefore, we cannot disturb it.

*Id.* at 369, 340 A.2d 240.

■ Contrary to appellant's contention, *Pemberton* does not compel the conclusion that the Board's determination that appellant failed to satisfy the first prong of the *Rockville Fuel* test was not "fairly debatable." *Pemberton* cannot, of course, stand for the principle that any work performed under any type of permit will qualify as a permit for any subsequent construction performed on the same property. In fact, the Court's rationale in that case turned upon the permit at issue being for the construction of a retaining wall that was "inextricably connected" to the gasoline station building because "a

gasoline station is, after all, probably more vitally comprised of the pumps and the underground storage tanks," the construction of which required a retaining wall at one end of the property. *Pemberton*, 275 Md. at 368–69, 340 A.2d 240.

The need for a demonstrated, inextricable connection between the permit granted and the ultimate erection, in order for the permit to be deemed to meet the first requirement for the vesting of rights, rests, in our opinion, upon more than merely an objective extrapolation of the steps from permit to project completion. At its fundamental level, the grant of a permit for any part of an erection, at least when that part is as preliminary in nature as grading and revetments, presupposes that the zoning authority is aware of the nature of the ultimate erection, or end-unit. A permit is, after all, a grant of permission by the zoning authority; it would be profoundly illogical to conclude that, although actual permission must be granted to *begin* to erect a structure, the permission granted extends automatically to the construction of the end-unit even in cases when the evidence does not establish that the zoning authority contemplated the erection of the end-unit in its initial grant of permission. If this were the case, then *any* permit for *any* kind of construction, regardless of the existence of actual or constructive knowledge on the part of the zoning authority of the nature of the end-unit, would satisfy the first prong of the vesting test. Such a result would vitiate the need for permission in the first place.

Moreover, the twin requirements for vesting—a valid permit and actual, recognizable construction—though separate requirements, cannot be divorced from each other entirely. The law in Maryland on vesting is particularly stringent as to the latter requirement—for property rights to vest, any construction under the permit must be recognizable to a reasonable member of the *general public* as the construction of the end-unit, not merely to a reasonable building inspector. *Prince George's County v. Sunrise Dev. Ltd. Partnership*, 330 Md. 297, 314, 623 A.2d 1296 (1993). Part of the rationale for such a high threshold is certainty that the public can recognize that a new zoning law is not being violated. *Id.*

In addition, the work must have been commenced "with the intention and purpose *then formed* to continue the work until the completion of the building." *Steuart Petroleum Co. v. Board of County Comm'rs,* 276 Md. 435, 444, 347 A.2d 854 (1975) (quoting *Rupp v. Earl H. Cline & Sons, Inc.,* 230 Md. 573, 578, 188 A.2d 146 (1963)). To impose these high hurdles of substantial commencement and good faith intent to complete the project (measured at the time of commencement), only to impose a very low hurdle for satisfaction of the first requirement of obtaining a permit, would be inconsistent, especially considering the complementary purposes of the two prongs of the *Rockville Fuel* test—obtaining official permission for construction and then ensuring that the public will be aware of this permission (by virtue of substantial construction at the time of the downzoning).

█ When a zoning authority issues a permit with no knowledge of the nature of the end-unit, the premise for the second prong collapses. Put another way, we may state the rule as the Court of Appeals did in *Rockville Fuel,* 266 Md. at 127, 291 A.2d 672, when it said that a vested right only resulted when the owner "has proceeded with such construction under [the permit] as will advise the public that the owner has made a substantial beginning to construct the building and commit the use of the land *to the permission granted." Id.* (emphasis added). This statement by the Court makes it clear that the "permission" contemplated by the vesting test is *permission to construct the end-unit,* and that the second prong requires that the owner make a "substantial beginning" in this direction. Seen in this light, *Pemberton* stands for the proposition that such permission to construct the end-unit may be implied by a permit to construct an erection that is integral to the end-unit. As noted *supra,* the Court in *Pemberton* simply was not confronted, as we are, with the question of whether the zoning authority was actually aware of the nature of the proposed end-unit.

█ It follows from the nature of the challenge to zoning authority that the property owner seeking to challenge

the downzoning bears the burden of establishing actual or constructive permission[6] for the end-unit. "An appellate court must apply the law in effect at the time a case is decided, provided that its application does not affect intervening vested rights." *O'Donnell*, 289 Md. at 508, 425 A.2d 1003. Accordingly, one claiming that a downzoning violates vested rights bears the burden of establishing the existence of a lawful permit, *Rockville Fuel*, 266 Md. at 124, 291 A.2d 672, because he or she is challenging the law in effect at the time the case is decided. *See County Council v. District Land Corp.*, 274 Md. 691, 702, 337 A.2d 712 (1975) (rezoning is "entitled to the same presumption of correctness as that enjoyed by an original zoning, and persons attacking the correctness of the classification have a heavy burden in overcoming the presumption of its validity."). In *Pemberton*, this burden was not an issue, for although the permit issued was only for the construction of a retaining wall and did not mention the filling station, actual permission was not disputed; the zoning authority in that case had conditionally approved the eventual construction and operation of an automobile filling station. *Pemberton*, 275 Md. at 366, 340 A.2d 240.

Our conclusion gleans further support from *Stewart Petroleum*. In that case, the appellant argued that it had acquired a vested right to build an oil refinery in part because it had obtained a permit for a warehouse and shop storage building, which it considered a part of an integrated refinery project. *Stewart Petroleum*, 276 Md. at 442, 347 A.2d 854. The Court of Appeals concluded that this portion of appellant's vested rights argument was "largely negated" because it conceded that "the warehouse building could be used for other purposes in the event that the refinery was not built." *Id.* Moreover,

---

6. Of course, should the property owner, when applying for a permit or when otherwise communicating with the zoning authority prior to the issuance of a permit, clearly indicate that the request for a permit is but a step in the chain for the construction of the end-unit, then knowledge by the zoning authority may be implied, for no landowner should be deprived of constitutional rights because of a mistake made by the zoning authority.

the Court explained, neither the applications for permits to construct the warehouse building, nor the site plan filed in support of them, contained any reference to the ultimate refinery project. *Id.* Thus, although it did not say so explicitly, the Court clearly indicated that the permits granted for the warehouse were not "permits" for a refinery that satisfied the first prong of establishing vested rights; this decision rested on a lack of evidence that the warehouse and refinery were, in fact, an integrated project.

In the case *sub judice,* the end-unit, or final contemplated erection, according to appellant, was a 120–slip commercial marina, with 210 linear feet of bulkhead and seventy feet of "stone flanked protection." There was to be a parking lot and a bathhouse. Appellant intended to fill in .25 acres of wetland for a minor road crossing. There would be a "turn-around" and room for the storage of small rowboats. The Army Corps of Engineers permit that appellant obtained was conditioned on the construction of dockside sewage pump-out facilities.

The March 20, 1987 grading permit, upon which appellant relies for its vesting argument, allowed mass grading over the entire property, and the construction of bulkheading and revetments over the entire parcel, not just the marina site. The Board found:

> [T]he grading which occurred was for the entire 60 acre site, including the R15 parcel, which is approximately 56.7 acres. The bulkheading was for the R15 zoned section only .... The revetment was for an almost equal portion of the R15 zoned property and the MA2 parcel.

The Board's conclusion that no "permit" was issued for the construction of a commercial marina is "fairly debatable" and supported by substantial evidence. Although appellant and appellee disagreed over the meaning of the notation "Reserved Parcel—Zoned MA–2" in the subdivision application, the Board impliedly credited the testimony offered by appellee over that of appellant's witnesses, and decided that the notation did not mean that the site was reserved specifically for a commercial marina.

A September 1985 traffic analysis report did not address a commercial marina. Although a Critical Areas Report dated April 24, 1985 mentioned a "potential marina," it said nothing about a commercial marina, and the circuit court noted that it was replaced two days later with another report that deleted this reference. In its place was a reference to a "fishing pier and boat launching facility within the MA–1 [sic] area." The application for the grading and revetments did not mention a commercial marina. Three letters from appellant's counsel to OPZ expressed appellant's objection to the proposed rezoning. Two of the letters include details on the grading, revetment, and residential construction, but make no mention of any plans for a commercial marina. Appellant did not pay permit fees for approval of a marina and failed to obtain water and sewer allocation for a marina.[7]

As appellant itself admits, the grading covered the entire sixty acres and the bulkheading was necessary to support the grading operation. None of it was specific to the marina site. Mark Padeletti, appellant's Director of Engineering and Development, testified that the revetment continued along the residential portion of the property and into the marina portion, and that mass grading took place all over the parcel so that there would be very little grading to do later. Witnesses for appellee testified that they were unaware that appellant undertook the grading operation in preparation for the construction of a commercial marina; in fact, Ward testified that Colbert had told him that appellant intended to defer any action on the marina site until "some time in the future."

The circuit court noted that appellant would have graded and built bulkheads and revetments to protect its residential

---

7. A.A.C.C. art. 28, § 5–106 states that all development in an MA2 zone is subject to the site plan review process. When appellant applied for the Bathhouse Permit, it also submitted a site plan for approval. The application, however, was only for a public utility (bathhouse) and the site plan submitted with it, according to Ward, showed the proposed parking lot and comfort stations. Although it showed a marina basin, the plan did not include any reference to piers or pilings, which Ward stated "would normally be required if someone was [sic] to submit a plan for construction of a marina."

property from erosion, even if it had no intent to develop a commercial marina. Appellant does not contest this statement on appeal. In addition, it seems fairly obvious that the grading that occurred would have been necessary for *any* structure permitted in that zone, not just a commercial marina. In this respect, this case is like *Steuart Petroleum*, because the grading work could have been used for another project even if the commercial marina were never built. *Steuart Petroleum*, 276 Md. at 442, 347 A.2d 854.

That the MA2 zone permits a commercial marina zone does not in itself vest in appellant the right to develop a commercial marina. Other uses are permitted within this zone that do not involve a 120–slip commercial marina; for example, A.A.C.C. art. 28, § 5–110 allows, as permitted uses, swimming pools, tennis courts, and restaurants. A.A.C.C. art. 28, § 5–110(6),(8). A plain reading of the ordinance does not reveal an absolute need to establish a pier facility in an MA2 zone, although such a use is contemplated and covered in the ordinance. The Board's decision that a valid permit was never issued for the construction of a commercial marina is fairly debatable and supported by substantial evidence. We will not disturb its judgment.

■ As an alternative argument, appellant asserts that appellee should be equitably estopped from relying on the absence of a separate marina permit because of appellant's good faith understanding that such a permit was not required and because, according to appellant, appellee falsely asserted that the marina site was not subdivided. The doctrine appellant invoked in the Board hearing and in the circuit court was that of zoning estoppel. *See Sycamore Realty Co. v. People's Counsel*, 344 Md. 57, 63, 684 A.2d 1331 (1996) ("Zoning estoppel is the theory of equitable estoppel applied in the context of zoning disputes."). Appellant's allegations in its brief, however, fail to state a claim for zoning estoppel that would be recognized by the courts of Maryland.

In *Sycamore Realty*, the Court rejected both the black-letter version and a much narrower, "bad faith" version of

zoning estoppel as incompatible with Maryland law, focusing all future analyses on the vesting of property rights, absent some "still narrower theory of zoning estoppel that may be compatible with our vested rights rule . . . ." *Id.* at 69, 684 A.2d 1331. In fact, the Court rejected the "badfaith" theory of zoning estoppel in the face of the appellant's claim that the zoning authority had deliberately delayed the appellant's proposed development until new zoning had been enacted that prohibited the development, facts similar to the case *sub judice.* *Id.* It is clear that the facts of this case do not support a "still narrower theory" of zoning estoppel than that rejected in *Sycamore Realty.*[8]

## II

In addition to its failure to satisfy the first prong of the vesting test, appellant fails to persuade us that the Board acted arbitrarily when it concluded that appellant had not begun substantial construction on a commercial marina, the second prong of the *Rockville Fuel* test. The mere expenditure of money is not enough to vest rights. *See Rockville Fuel,* 266 Md. at 125–26, 291 A.2d 672. Rather, in order to obtain a vested zoning status, there must be construction on the ground. *Washington Suburban Sanitary Comm'n v. TKU Assoc.,* 281 Md. 1, 23, 376 A.2d 505 (1977). Converging lines of cases, which need no explication here, have culminated in the test for substantial ground construction that was pronounced by the Court of Appeals in *Sunrise Development,* 330 Md. at 314, 623 A.2d 1296:

> [W]e hold that, in order for rights to be vested before a change in the law, the work done must be recognizable, on inspection of the property by a reasonable member of the

---

8. In its argument to the circuit court, appellant relied exclusively on the theory of zoning estoppel to argue that its rights vested notwithstanding OPZ's actions. The record reveals that appellant also relied exclusively upon the "zoning estoppel" facet of equitable estoppel in its argument to the Board. Thus, any other facet of equitable estoppel that may have applied in this situation is not before us for consideration. *See* Mᴅ. Rᴜʟᴇ 8–131(a).

public, as the commencement of a building for a use permitted under the then current zoning.

The Board concluded that "the grading, bulkheading, and revetment construction would not have operated to advise the neighborhood as to the intended use of the MA2 parcel as a commercial marina." In holding the Board's conclusion supported by substantial evidence and fairly debatable, we are mindful that the Board conducted a physical inspection of the property as part of its investigation. Integral to the Board's decision was the extensive nature of the revetments, bulkheads, and grading that took place. We see no compelling reason to overturn its conclusion that such preliminary work would not be recognizable by a reasonable member of the *general public* as the beginning of a commercial marina. *See id.* ("It is clear ... that a theoretical, reasonably diligent building inspector is not the test of the beholder.").

Appellant argues that the Board failed to consider the installation of new deckboards and stringers on the existing pier, the repair of existing pilings, and the lease of slips to the public, when it decided that appellant's rights had not vested. Furthermore, argues appellant, the Board ignored the testimony of Larry Williams, a resident of Stoney Beach and "a member of the public," that he had learned about the planned marina one year prior to purchasing his property. Finally, says appellant, the public was notified of the intended use of the property by appellant's marketing campaign and by the large picture of the complete commercial marina in the sales office.

The testimony of Williams, the marketing campaign, and the picture of the commercial marina in the sales office are irrelevant to whether a reasonable member of the public, upon inspecting the property, could have recognized the work as the beginning of a commercial marina. The test is objective, not fulfilled by one person's testimony of his understanding of the property's function, nor by a photograph of the eventual use displayed in a location removed from the site of actual con-

struction.[9] To interpret the "reasonable member of the public" test in this manner would not further its underlying purpose—that the *general* public, upon *inspection of the property,* recognize that the new law is being observed or enforced. *Sunrise Development,* 330 Md. at 314, 623 A.2d 1296.

We are similarly unconvinced that we must vacate the Board's decision because it did not specifically mention the use of the existing pilings and the construction of new deckboards and stringers, as well as the lease of slips to the public. First of all, the lease of slips to the public is not "construction," and is irrelevant to the issue of whether appellant's rights had vested in the MA2 zone prior to the downzoning. In addition, the repair of existing pilings and the placing of new deckboards and stringers, while arguably relevant to the issue of substantial construction, is not sufficient to overturn the Board's finding that substantial construction on the 120–slip commercial marina had not commenced by the time of the downzoning. Appellant allegedly intended to construct a new, 120–slip commercial marina, complete with parking lot and bathhouse. The leasing of the slips, by all indications from the record, was a relatively small operation conducted by repairing and utilizing limited facilities that already existed.[10] Substantially different in scope and kind, the leasing operation thus would not have notified the public that a large commercial marina was to be built, rather than a smaller operation or

---

**9.** We do not imply that a photograph posted on-site would fulfill the requirements of *Sunrise Development,* any more than a photograph posted off-site. We need not reach this question, however.

**10.** As noted *supra,* appellant does not indicate—and our review of the record did not reveal—how many slips were in fact leased in the late 1980's, or how prominent the leasing operation was. The record reveals that no use and occupancy permit was obtained, and no slip tax collected.

We also note that appellant did not argue below—and does not argue here—that the leasing operation that it conducted before the effective date of the downzoning qualifies as a nonconforming use that appellant is entitled to continue. Appellant rests entirely on its argument that the leasing of slips contributed to the "substantial construction" of the planned commercial marina operation in a way that vests rights in appellant.

a community marina, which is permitted by special exception in the new zone, R5. At any rate, the issue is certainly "fairly debatable," and we think that "a reasoning mind could reasonably have reached the same result as did [the Board] upon a fair consideration of the factual picture painted by the entire record before that body." *Pemberton*, 275 Md. at 367–68, 340 A:2d 240.

## B

In its final argument, appellant contends that we should adopt as Maryland law the "common scheme of development" rule of vesting, as set forth in the New York case *Schoonmaker Homes—John Steinberg, Inc. v. Village of Maybrook*, 178 A.D.2d 722, 576 N.Y.S.2d 954 (1991). In that case, a New York appellate court described the "single integrated project theory" that controls in that jurisdiction:

> Pursuant to that theory an owner might acquire vested rights to a site where substantial construction had not been undertaken where the site is but a part of a single project and where, prior to the more restrictive amendment, substantial construction had been commenced and substantial expenditures made in connection with other phases of the integrated project which also benefited or bore some connection to the affected site.

*Id.*, 576 N.Y.S.2d at 956.

We need not decide whether to adopt *Schoonmaker* as Maryland law, for the facts of this case do not support its application. Appellant failed to cite this case or make this specific argument to the Board, and so the Board had no opportunity to apply the law of that case to the facts of this one. Nevertheless, the Board cited *Equitable Trust Co.* for its conclusion that appellant's rights to develop the marina site under an MA2 zoning classification did not vest because of the development on the residential site.

In *Equitable Trust Co.*, we held that the right to develop an 11.2–acre parcel of land was not obtained with the beginning of construction on a 0.8–acre parcel of adjoining land. *Equita-*

*ble Trust Co.,* 44 Md.App. at 281–82, 408 A.2d 737. Although this portion of our opinion interpreted specific statutory language instead of the law of vested rights, the principle was roughly the same. We held that the two sections of land had been subdivided into two separate parcels; there was no perceivable nexus between them, and the evidence did not indicate that the owner contemplated a use for the remaining land. *Id.* at 282, 408 A.2d 737. We held, therefore, that the development on the 0.8–acre parcel did not preclude rezoning the larger parcel. *Id.* at 281–82, 408 A.2d 737.

 The Board in this case applied *Equitable Trust Co.* to the facts of the case *sub judice,* referring to the "umbrella theory" of *Equitable Trust.* The Board stated:

Although in this case it is the larger parcel (56.7 acres) and not the smaller parcel (3.3 acres) which was developed, and although the developer had made previous reference to an intended use of the parcel as a commercial marina, this Board does not find that the MA2 zoned parcel vested because of the construction activity which occurred on the R15 parcel.

Thus, the Board impliedly concluded that, under *Equitable Trust Co.,* appellant failed to demonstrate a sufficient nexus between the two parcels that would vest construction rights under the MA2 zone, even though it had made some previous reference to the intended use of the marina site as a commercial marina. For the same reasons for which we hold *supra* that no right to the MA2 zoning classification vested under Maryland's traditional vesting theory, we find the Board's conclusion supported by substantial evidence on the record.

Furthermore, if the Board was not arbitrary in its decision under *Equitable Trust Co.,* then the evidence is surely insufficient for appellant to obtain vested rights under *Schoonmaker,* for we read *Schoonmaker* as requiring more convincing proof of a nexus between the two parcels than that implied by *Equitable Trust Co.* In *Schoonmaker,* the developer of a tract was barred from constructing a desired number of garden apartments by a lowered density allowance enacted after the

developer purchased the land and incurred substantial expenses in connection with the development. The developer had also constructed apartments on other areas of the tract before the lower density allowance went into effect. Central to the court's conclusion, however, were the following facts:

> *It is clear* that petitioner acquired 55 acres of land for development, proposed a single overall plan for all of the acreage, communicated its intent for the proposed project to the Village's Planning Board and obtained final approval for its subdivision plat which was filed.

*Schoonmaker*, 576 N.Y.S.2d at 957 (emphasis added). The developer had installed a roadway base and had constructed water, sewer, and drainage systems for the contested site. *Id.*

In the case *sub judice*, the Board found little evidence that appellant communicated its intent to the OPZ, and cited ample evidence that OPZ was unaware of the intended expansive use of the marina site. Appellant also never paid the fees to obtain sewer or water allocation for the marina site, much less actually constructed the complete systems there. For these and the many other reasons detailed *supra*, we hold that the findings of fact implicit in the Board's application of *Equitable Trust Co.* would prevent *Schoonmaker* from dictating the outcome of this case. We therefore find it unnecessary to decide whether to adopt *Schoonmaker*. We come to the same conclusion when considering the other case cited by appellant, *Eklund v. Clackamas County*, 36 Or.App. 73, 583 P.2d 567 (1978). The Oregon Court of Appeals in that case held that a developer had acquired vested rights to extend a water system to 108 homes free from the edict of a zoning authority created after the developer had incurred the substantial cost of installing the water system to service all 108 homes. *Id.*, 583 P.2d at 570–71. The court concluded:

> The water system was built to serve the entire subdivision and had been approved by the State Health Division prior to creation of the [zoning authority] in 1973. All equipment necessary to serve the residences to be built in [the undeveloped portion of the subdivision] was in opera-

tion. Only the lateral lines connecting the homes with the existing water main would have to be installed.

*Id.* at 571. Of course, in the case *sub judice,* the gulf between proposed use and existing use is wider than the mere connection of water lines. The Board impliedly concluded that the link between marina site and the residential site was tenuous at best; we do not find this to be an unreasonable conclusion.[11]

## JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED.

## COSTS TO BE PAID BY APPELLANT.

---

**11.** Appellant also cites *Hickory Point Partnership v. Anne Arundel Co.,* 316 Md. 118, 557 A.2d 626 (1989) and *Steuart Transp. Co. v. Ashe,* 269 Md. 74, 304 A.2d 788 (1973) for the proposition that "[t]he right of a property owner to build under a common scheme of development is respected in Maryland." These two cases are inapposite. *Hickory Point* expressly declined to decide any questions of property rights. *Hickory Point,* 316 Md. at 134, 557 A.2d 626 ("[A]ny conflict between new regulations and claimed Property Rights cannot be resolved in the abstract."). *Steuart Transp. Co.* dealt with the enforceability of restrictive covenants between private landowners. There was no discussion about zoning.