KASTENDIKE ET UX. *v.* BALTIMORE ASSOCIATION FOR RETARDED CHILDREN, INC.

[No. 97, September Term, 1972.]

*Decided December 14, 1972.*

---

390

The cause was argued before SINGLEY, SMITH and DIGGES, JJ., and RICHARD P. GILBERT, Associate Judge of the Court of Special Appeals and WILLIAM B. BOWIE, Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Alfred H. Kreckman, Jr.,* and *John J. Ghingher, Jr.,* with whom were *Weinberg & Green* on the brief, for appellants.

*Eugene P. Smith* for appellee.

DIGGES, J., delivered the opinion of the Court.

Mr. and Mrs. George H. Kastendike, appellants, must believe in the statement, "Love your neighbor, yet pull not down your hedge." [1] For while professing no rancor toward or intention to prohibit their neighbor, The Baltimore Association for Retarded Children, Inc. (BARC), appellee, from moving in, the Kastendikes insist that the move should not be allowed unless BARC obtains approval of the Mayor and City Council of Baltimore City. More particularly, this case involves the lawfulness of the use of the premises at 218 Ridgewood Road, in Baltimore, by the appellee, as a home for the care of retarded adults. Mr. and Mrs. Kastendike have sought to have such a use, without the assent of the Mayor and City Council, declared illegal and enjoined; and toward that end, on March 4, 1971, they filed their bill of complaint. From an order entered in the Circuit Court No. 2 of Baltimore City, whereby Judge Meyer M. Cardin refused to grant the relief requested by the Kastendikes, this appeal is taken. As we conclude that Judge Cardin correctly refused to enjoin this use of the property, we affirm his order.

The appellants contend that the premises cannot be used as a home for retarded adults unless BARC obtains

---

1. *Jacula Prudentum*, written by George Herbert (1593-1633).

not one but two authorizations from the Mayor and City Council. The Kastendikes posit that these are required by Article 12, § 1 of the Baltimore City Code (1966 ed.) and additionally by the provisions of the 1971 zoning ordinance, No. 1051. To demonstrate the error of appellants' contention and show why we concluded that Judge Cardin was correct, it is necessary to journey back to the year 1873. In that year, Ordinance No. 5 was passed and it then read in pertinent part:

"An ordinance in relation to hospitals for the sick.

Whereas, the establishing of hospitals for the sick in the densely populated portions of the City of Baltimore is of doubtful utility in the matter of the public health, while the effect thereof is to materially depreciate the value of private property in the vicinity in which they may be located, therefore

Section 1.—Be it enacted and ordained by the Mayor and City Council of Baltimore, That it shall not be lawful to establish any hospital for the sick within the limits of direct taxation, unless by and with the assent of the Mayor and City Council of Baltimore; provided, that before such assent shall be given, public notice shall be given of an intention to apply to the City Council for such grant, which public notice shall be given at least thirty days before the City Council shall act upon the application, and published at least once a week for four weeks in not less than two of the daily newspapers of the city."

This non-zoning ordinance, thus, required assent for the establishment of a "hospital for the sick," although nowhere in the ordinance is this phrase defined.

Returning to the 20th Century, in 1931 a comprehensive zoning ordinance for the City, No. 1247, was enacted. Under this law, the neighborhood in which the

218 Ridgewood Road property is located was zoned as a residential use district. Within such a district, all uses of land or buildings were permitted except for those specifically excluded. The uses to which this property was put between the years 1931 to 1946 are unclear from the record, but none of the parties contests the fact that by January 1946, the building on this property was used as a nursing home for the aged. At that time, the premises was owned by two sisters, Ola and Caroline Gaddis, who established and operated the nursing home there until 1966. The establishment of this nursing home was not accompanied by the obtention of assent from the Mayor and City Council. But, at the trial of this case, the testimony of the zoning enforcement officer for Baltimore City, Mr. Franklin Aschemeier, Jr. indicated that in 1946 a nursing home was not considered to be a "hospital for the sick" so as to require assent. Mr. Aschemeier, in his testimony, stated that those zoning officials charged with enforcement of the regulations did not consider that assent was required for a nursing home and they were permitted in a residential use district without any approval from the Mayor and City Council. The validity of this interpretation is buttressed by the fact that, apparently in order to include nursing homes within the provision requiring assent, an amending ordinance, No. 29, was approved, on August 1, 1947, which defined "hospital" in an all-inclusive way. This ordinance, codified as Art. 12, § 1, Baltimore City Code (1966 ed.) reads in part:

> "It shall not be lawful to establish any hospital for the sick in the City, unless by and with the assent of the Mayor and City Council of Baltimore; provided, that before such assent shall be given, public notice shall be given of an intention to apply to the City Council for such grant, which public notice shall be posted in a conspicuous place on the premises and be published at least once a week for four weeks in not less than two of the daily newspapers of

the city, at least thirty days before the City Council shall act upon the application. "Hospital", as herein used, means any place or institution which maintains and operates facilities for the care, custody and/or treatment of two or more non-related persons as patients suffering mental or physical ailments but shall not be construed to include any dispensary or first-aid treatment facilities maintained by any commercial or industrial plant, educational institution or convent."

The Gaddis Nursing Home, opened in 1946, prior to the approval of Ordinance No. 29, was operated continuously until the death of Caroline in 1966. That year, the property was sold to 218 Ridgewood Road, Inc. which maintained the premises as a nursing home for the aged until 1969. Then, the property was sold to the Encore House Foundation, Inc. which operated the home as a nursing home for the aged and a treatment center for non-bedridden alcoholics until late December 1970, when all the patients were moved out in anticipation of settlement on the sale of the house to the appellee. Until now, despite the fact that none of these owners obtained the assent of the Mayor and City Council, no objections were registered about their operations by any governmental official, or, for that matter, by anyone else.

In November, 1970, Encore entered into a contract to sell the property to BARC, and on February 5, 1971 settlement was made. The home was then to be used as a treatment center and care home for retarded adults; but, before actual operations could begin, certain internal repairs were necessary to comply with fire and health requirements. These undertakings were deferred when, one month after settlement, appellants instituted this action. Later, on April 20, following the filing of this suit, the Baltimore City Zoning Ordinance was completely revised by Ordinance No. 1051 which rejected the permissive zoning of the 1931 ordinance and its amendments and replaced it with an exclusory plan. Now, the BARC

property is in a R-1 residence district where permitted uses are listed and all others are excluded except for certain enunciated accessory and conditional uses. Convalescent, nursing and rest homes, and hospitals are conditional uses that may be permitted in this district but require authorization by ordinance of the Mayor and City Council prior to their establishment.

Under the facts we have just recited and the applicable ordinances, the Kastendikes contend in their brief that:

> "first, BARC should obtain an ordinance under Article 12, Section 1, Baltimore City Code (1966 Edition) regulating the establishment of 'hospitals' (defined to include care homes) and second, BARC should comply with the provisions of the 1971 Zoning Ordinance requiring Mayor and City Council approval of that use."

We shall discuss these issues in the order in which appellants present them.

# I

The Kastendikes claim that BARC is establishing a hospital and, therefore, under the provisions of Article 12, § 1, Baltimore City Code (1966 ed.) is required to obtain the assent of the Mayor and City Council. We cannot agree. The ordinance requiring assent for nursing homes was not approved until August 1, 1947 and prior to that time such approval was not deemed necessary for the establishment of a care home. The history of this case indicates that the Gaddis sisters established their nursing home prior to the ordination of this requirement. Therefore, the Gaddis Nursing Home did not require an assent ordinance prior to its establishment unless Ordinance No. 29 was specifically enacted to have retrospective effect.

The general presumption is that all statutes or ordinances are to be given prospective application unless the manifest intention of the enacting body was to the

contrary. *Unsatisfied Fund v. Bowman,* 249 Md. 705, 708, 241 A. 2d 714 (1968). As we said in *Tax Comm. v. Power Company,* 182 Md. 111, 116-17, 32 A. 2d 382 (1943) :

> "Laws are generally enacted to regulate future conduct and establish the basis upon which rights are thereafter to be predicated; they are not usually designed to change the legal relation of closed transactions, especially if the change would interfere with antecedent rights. It is well settled that a statute will not be given a retrospective operation, unless its words are so clear, strong and imperative in their retrospective expression that no other meaning can be attached to them, or unless the manifest intention of the Legislature could not otherwise be gratified."

Here, there is no express language indicating retroactive effect. And, from our reading of Article 12, § 1, we are convinced that it was not the intention of the City Council to interfere with any existing establishment. In fact, it might be questioned whether it could give a retrospective operation to such an ordinance. *Glenn v. M. & C.C. of Balt.,* 5 G. & J. 424, 430 (1833). Thus, clearly, the action of the Gaddises in establishing their nursing home did not require assent. But, does this immunity from the requirement by the prior owners insulate their successors in interest? We conclude that it does. Since this home was lawfully established without approval, as at the time of its inception no assent was needed, it is analogous to a zoning non-conforming use under the non-zoning requirement for approval in Art. 12, § 1. The subsequent changes in ownership of the premises and changes from treatment of the aged and alcoholic to care for retarded adults does not affect the right of the new owner to continue without assent. *Cf. Green v. Garrett,* 192 Md. 52, 63 A. 2d 326 (1949) ; *Parr v. Bradyhouse,* 177 Md. 245, 9 A. 2d 751 (1939). *See also* Annot., 9 A.L.R.2d 1039 (1950). Though *Green* and *Parr* are

zoning cases involving non-conforming uses, they are instructive as to the course to follow in the case here. In *Green,* some taxpayers of Baltimore City attempted to enjoin the Department of Recreation and Parks from permitting the use and occupancy of Baltimore Stadium by a professional baseball team. Chief Judge Marbury, speaking for this Court in *Green, supra* at 63, stated that:

> "The second contention of the appellants is that the use of the Stadium for the playing of professional baseball contravenes the zoning ordinance of Baltimore, because it is located in a district of Baltimore City which is zoned for residential use. The zoning ordinance was passed in 1931, after the Stadium was built, and after it had been used for professional football games, and at least one professional baseball game. It had also been used for football games by the United States Naval Academy, for which purpose it had been leased. There was, therefore, a non-conforming use, established before the adoption of the zoning ordinance, which the Department was entitled to continue. The appellants contend that the enlargement of this use to include professional baseball games for a considerable period of a year is not within the exemption, but we cannot so find. We held in the recent case of *Colati v. Jirout,* 186 Md. 652, 47 A. 2d 613, that the spirit of the zoning ordinance is against the extension of non-conforming uses, and that such uses should not be perpetuated any longer than necessary. We have never held that the more frequent use of a property for a purpose which does not conform to the ordinary restrictions of the neighborhood is an extension of an infrequent use of the same building for a similar purpose. We do not think such a contention is tenable. Nor does it seem to us that a different use is made of the Stadium when the

players of games there are paid. The use of the
property remains the same. And, if it does not,
the zoning ordinance permits a non-conforming
use to be changed to a use of the same classifica-
tion."

Similarly, in *Parr*, efforts were made to prevent a Mr.
Bradyhouse from renting a tract of land that was for-
merly used for a dairy business and turning it into a
riding academy. This Court would not allow the exclusion
of the riding academy and found that the change from
cows to horses could not affect the right to use the land
as a non-conforming use. *See also Feldstein v. Zoning
Board*, 246 Md. 204, 227 A. 2d 731 (1967) (increase in
quantity and height of scrap metal stored in junkyard
was intensification and not extension of owner's vested
non-conforming use); *Jahnigen v. Staley*, 245 Md. 130,
225 A. 2d 277 (1967) (intensification of a non-conform-
ing use is permissible so long as the nature and character
of the use is unchanged and substantially the same fa-
cilities are used). Likewise, we conclude that the similar-
ities between the various uses of the premises as a nurs-
ing home are greater than the differences and the
changes, if any, in the type of patients cared for are in-
consequential.

We, therefore, conclude that, since the premises had
been lawfully established as a nursing home by the Gaddis
sisters by 1946 and has continued to be used as such
since then, when BARC purchased the home in 1970, it
did not need to obtain the assent of the Mayor and City
Council under Article 12, § 1 in order to continue that
use.

## II

Appellants next contend that under the new, 1971 Bal-
timore City zoning ordinance, No. 1051, BARC was re-
quired to obtain assent of the Mayor and City Council
before utilizing the premises as a nursing home. It is fur-
ther claimed by the Kastendikes that the nursing home
is not a non-conforming use as it was not lawfully es-

tablished by the Gaddis sisters in 1946, or, assuming that it was lawfully established, BARC was not continuing to utilize the premises as a non-conforming use on April 20, 1971, the date the new zoning ordinance was approved.

On April 20, 1971 this entirely new comprehensive zoning ordinance was approved for Baltimore City. Under this ordinance the City was divided into ten residence districts, an office-residence district, five business districts, and three industrial districts. The permitted, accessory, and conditional uses allowed in each district are specified and all others are excluded. This is exactly opposite from the 1931 ordinance which permitted everything that was not excluded. The property owned by BARC is located in an R-1 or single family residence district. In Part B, § 4.1-1 use regulations for an R-1 zone are specified. Subsection d thereof, in part, states that:

"d. Notwithstanding other provisions of this ordinance, the following uses as conditional uses shall require authorization by ordinance of the Mayor and City Council subject to the requirements and provisions of Section 11.0-6d:

1. Convalescent, nursing, and rest homes".

A "convalescent, nursing, and rest home" is defined in § 13.0-2 16 as:

"a home for aged, chronically ill, infirm, or incurable persons, or a place of rest for those persons suffering bodily disorders, in which three or more persons are received and provided with food, shelter, and care—but not including hospitals, clinics, or similar institutions devoted primarily to the diagnosis and treatment of disease and injury, maternity cases, or mental illness."

This definition encompasses BARC's operation. The assent requirement of the zoning ordinance is found at § 11.0-6d and specifies that:

"d. *Conditional Uses by Authority of the City Council.* Certain conditional uses are designated in this ordinance as requiring City Council approval. The City Council, after public notice and hearing, may authorize such uses through enactment of an ordinance and in harmony with the purpose and intent of this ordinance. All conditional uses proposed and introduced into the City Council shall be referred by the City Council to the Board, the Planning Commission, and such other agencies as determined by the President of the City Council for written report and recommendations."

However, Chapter 8 of the ordinance makes provision for the continuance of non-conforming uses, which is defined in § 13.0-2 54 of Chapter 13 as: "any lawfully existing use of a building or other structure or of land which does not conform to the applicable use regulations of the district in which it is located." If under the 1931 zoning ordinance this nursing home was lawfully established, then, under Chapter 8, it may continue as a non-conforming use and no assent is required for designation as a conditional use.

Appellants submit that this nursing home does not exist as a lawful non-conforming use as it was not "lawfully existing" under the provisions of the 1931 zoning ordinance. That ordinance permitted all uses in a residential use district except for the 44 excluded uses listed in paragraph 8. In the case of *Parr v. Bradyhouse,* 177 Md. 245, 247, 9 A. 2d 751 (1939), we characterized this list as the "forty-four businesses excluded from a residential use district," and we indicated that if the Mayor and City Council overlooked or never thought of adding a particular exclusion to the list, they should not ask this Court to write the exception or omission made by them into their ordinance. Clearly, a nursing, convalescent, care, or rest home is not explicitly excluded by the list. But the Kastendikes argue that such homes are

prohibited by the fifth exclusion in this alphabetical list which in its entirety reads "5. Business". The appellants would have us define "business" broadly so as to include a nursing home and, thus, declare the use unlawful.

The word "business" has a very broad significance and a great variety of meanings and the precise meaning of the word depends on how it is defined in the ordinance or the context in which it is used. Unfortunately, the word is nowhere defined in the 1931 ordinance. Therefore, we must garner the intent of the City Council from the context in which the word is used and from its ordinary and customary meaning. *Zurich Insur. Co. v. Friedlander,* 261 Md. 612, 276 A. 2d 658 (1971). As we said in *Zurich, supra* at 616:

> "The broad definition of 'business' is that adopted by the Supreme Court in *Flint v. Stone Tracy Co.,* 220 U. S. 107, 171, as 'That which occupies the time, attention and labor of men for the purpose of a livelihood or profit.' Under this broad concept, obviously one who devoted enough time and attention to buy a hundred shares of stock, looking for a profit, could be said to be in the business of investing.
>
> However, this broad meaning of the word business is not the meaning the word ordinarily and customarily conveys. The ordinary and customary meaning is that reflected in Webster's Third New International Dictionary as 'commercial or mercantile activity customarily engaged in as a means of livelihood' or two definitions given by Funk and Wagnall's New Standard Dictionary of the English Language:
>
> '1. A pursuit or occupation that employs or requires energy, time or thought; trade, profession, calling.
> 2. Any occupation connected with the operations and details of trade or industry,'
>
> or, one given by Black's Law Dictionary (3rd

ed.) : ' "Business" is often synonymous with calling, occupation or trade.' "

In different contexts, the word "business" may mean different things. For example, it is clearly established that hospital records are admissible into evidence under proper circumstances as a "business" record. *See Snyder v. Cearfoss,* 190 Md. 151, 57 A. 2d 786 (1948) ; Art. 35, § 59, Code (1957, 1971 Repl. Vol.) where for purposes of evidential proof by written records, " 'business' shall include business, profession, occupation and calling of every kind." Therefore, while a hospital or nursing home *may* be considered as a business in some contexts, we must determine if that was intended here. *See* 101 C.J.S. *Zoning* § 164 (1958).

In the 1931 ordinance, "business" is listed with 43 other excluded activities all of which except for correctional or penal institutions are commercial establishments. While we must profess some bewilderment as to why the word "business" without further explanation was included on the list, we do not think its presence on the list is dispositive of this case. We conclude that "business", as here used, must refer to commercial or mercantile businesses similar to the others on the list using the word "business," *e.g.,* "library, or club, the chief activity of which is a service customarily carried on as a business, undertaking business, the following places of business where services are rendered: clothes pressing, beauty parlor, barber shop, photographic establishment, printing establishment, radio shop, shoe repair shop, poultry killing or dressing, cat or dog hospital, automobile or storage battery service station." If "business" was to be all inclusive, it would have been unnecessary to list all the other exclusions. Additionally, those people charged with enforcing the zoning ordinance did not consider nursing homes excluded from residential use districts as the evidence here shows that 80% of the nursing homes licensed by the State Department of Health and Mental Hygiene were located in residential areas, and more than 50% of these were ex-

pressly approved by the Mayor and City Council. If such homes were excluded as a "business" no licensing or approval would be possible so as to permit such an operation in an area in which it was excluded. Thus, we conclude that the Gaddis Nursing Home which was established by 1946 was "lawfully existing." As we indicated in part I of this opinion, the mere change of ownership and treatment of different residents with diverse medical problems does not destroy the non-conforming use. *See, e.g., Hawkins v. Talbot,* 80 N.W.2d 863 (Minn. 1957) ; *Beers v. Bd. of Adjust. of Wayne Tp.,* 75 N. J. Super. 305, 183 A. 2d 130 (1962) ; *Hyams v. Amchir,* 57 N.Y.S.2d 77 (1945) ; *Gibbons & Reed Company v. North Salt Lake City,* 19 Utah 2d 329, 431 P. 2d 559 (1967). We, therefore, conclude that the home established by the Gaddises was lawful under the 1931 zoning ordinance and as conveyed to their successors in interest would constitute as lawful any continuation of a similar operation so long as the "nature and character of the use is unchanged and substantially the same facilities are used." *Jahnigen v. Staley,* 245 Md. 130, 137, 225 A. 2d 277 (1967).

If we find that this non-conforming use was not abandoned but was continuously operated without extension until the time the new ordinance was approved, then no assent was necessary and Judge Cardin was correct in allowing BARC to use the home as a care and treatment facility for retarded adults. There is ample evidence in the record to justify a finding that from its establishment in 1946 until late December 1970, when Encore left the premises to make room for BARC, the premises was continually used as a nursing home. Appellants contend, however, that BARC abandoned that use. We do not agree. Section 8.0-4 f of the new zoning ordinance states :

"Whenever any Class III non-conforming use, or any part thereof, has been discontinued for a period of 12 consecutive months, such discon-

tinued non-conforming use, or part thereof, shall not thereafter be re-established, and any subsequent use of that land, structure, or part thereof, shall conform to the regulations of the district in which the land or structure is located. Such discontinuance of the active and continuous operation of such non-conforming use, or any part thereof, for such period of 12 months shall constitute an abandonment of such non-conforming use, or part thereof, respectively, regardless of any reservation of an intent not to abandon same or of an intent to resume active operations. If within a period of less than 12 months, actual abandonment in fact is evidenced by removal of structures, machinery, or equipment, or by alterations indicating a change in the use of the land, structure, or part thereof, the abandonment shall be completed at the time of such event and all rights to re-establish or continue such non-conforming use, or part thereof shall terminate as of that time."

Here, no 12 month discontinuance of use took place. In fact, despite hindrance by the institution of this suit one month after the settlement date of February 5, 1971, and the need for certain internal repairs, the first resident moved into the house in September 1971. As this period is within the 12 months allowed by the ordinance before a non-conforming use is statutorily deemed abandoned, there must be proof of actual abandonment as defined in the statute to justify a termination of BARC's right to carry on such a use. No such proof is offered. Therefore, since the use as a nursing home from 1946 until BARC started operation was continuous and was never abandoned, the lawfully existing non-conforming use is permitted under the new zoning ordinance. Neither the change in ownership nor change from treatment of the aged or alcoholic to care of the mentally re-

tarded eradicated or acted to extend the non-conforming use.

Appellants make one last thrust in an effort to parry defeat. They claim that since BARC was not in actual operation on April 20, 1971, when the new ordinance was passed, then it cannot be considered as a non-conforming use. The Kastendikes rely on our holding in *Harris Used Car v. Anne Arundel Co.*, 257 Md. 412, 263 A. 2d 520 (1970) as support for their position. While we do not retreat from our holding in *Harris* that "a mere intention to use is not enough to establish a non-conforming use," we think that case is clearly distinguishable. There, this Court found that the chancellor was not clearly erroneous in concluding that the subject land was not being used as a non-conforming use on the day of enactment of the zoning ordinance as any such use had been abandoned several years before the effective date of the ordinance. We conclude that rather than being controlled by *Harris,* the case of *Higgins v. City of Baltimore,* 206 Md. 89, 110 A. 2d 503 (1955), is dispositive of the issue now before us. A paraphrase of our observation in *Higgins, supra* at 100, is appropriate here—the appellee had gone far beyond the "expectation" stage of continuing this use and if BARC had not completely consummated its permitted change to a care home for mentally retarded adults prior to the adoption of Ordinance No. 1051, of April 20, 1971, it seems a reasonable inference that the institution of this suit may have prevented it.

In sum, we conclude that the trial court was correct in denying the relief sought by the Kastendikes and we, therefore, affirm its decision.

> *Order affirmed. Costs to be paid by appellants.*