698 A.2d 1127

**Leland Ross PIERCE**

v.

**MONTGOMERY COUNTY, Maryland et al.**

**No. 1304, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Aug. 27, 1997.

Leland Ross Pierce, Bethesda, for Appellant.

Charles W. Thompson, Jr., County Attorney, Linda B. Thall, Chief Counsel Division of Special Projects and Karen L. Federman Henry, Associate County Attorney, on the brief, Rockville, for appellee, Montgomery County, MD.

Stephen P. Elemendorf, Abigale Bruce–Watson and Linowes and Blocher L.L.P., on the brief, Silver Spring, for appellee, Baptist Home for Children and Families.

Submitted before CATHELL and SONNER, JJ., and JOHN J. BISHOP, Judge (retired), Specially Assigned.

JOHN J. BISHOP, Judge (retired), Specially Assigned.

This appeal involves an order of the Circuit Court for Montgomery County, which affirmed an order of the Board of Appeals for Montgomery County granting a modification to a special exception. Appellant, Leland Ross Pierce, owns a house adjacent to the Baptist Home for Children and Families, operated and owned by the Baptist Home and Montgomery County, appellees.

### Issue

Pierce argues, in essence, that the trial court erred in affirming the order of the Board of Appeals, because the Board failed to determine whether the proposed modification constituted an expansion. Pierce posits that the proposed modification unquestionably involves an expansion and argues that, because the Baptist Home does not front on a public road built to arterial or higher standards, the Board's approval was improper. We find no merit in this argument and affirm.

### Facts

The Baptist Home was founded in 1915 as an orphanage. In 1930, it was moved to its current location—a 13.04 acre parcel of land in Bethesda which was later zoned R–60 for single family homes. The original building on the property housed, and still houses, 42 persons.

In 1971, the Baptist Home petitioned the Board of Appeals for permission to construct two more dormitories on the property. One would house ten boys and one would house ten girls, thus bringing the number of children at the Home to 62. The Board granted the petition and at the same time found the Home, as a charitable or philanthropic institution, to be a

special exception. A written opinion issued by the Board recognized that the children housed at the Home "come from the Montgomery County Social Services, some from broken homes, and all are dependent." The Board further recognized that "[c]ounselling is provided at the Home in the area of social, religion, and psychiatric."

At some point after 1971, the goals of the Baptist Home evolved and the Home began accepting homeless families as well as children. In mid–1995, the Home submitted the petition in issue to the Board. In the petition, the Home requested permission to make modifications as follows:

— Conversion of the existing boys' dormitory to [become] the Greentree Training Facility[, including a 465 square foot addition].

— Conversion of the existing girls' dormitory to a boys' dormitory.

— Construction of a new girls' dormitory.

— Modification to the existing shelter component to recognize that the shelter now accommodates children and adults.

The Home explained in the petition that

BHCF seeks Board approval to relocate some of its existing counseling programs and its education programs to the Greentree Training Facility. BHCF also seeks Board approval to expand its job training program at the Greentree Training Facility for all residents to include furniture refinishing, small appliance repair, computer training and a program to rehabilitate donated goods for use by the existing residents. As the new location for the Greentree Training Facility, the converted boys' dormitory will provide much-needed additional space for these important counseling and education activities.

The Home also sought permission to add seven parking spaces, bringing the total number to 58. It did not seek permission to increase the number of residents.

In the petition, the Home explained:

The education and counseling services that BHCF has provided through the years have evolved and expanded to meet the needs of its residents. In a continuing effort to meet those needs, BHCF now seeks Board approval for an "expansion or enlargement" that, in reality, will maintain the two-dormitory housing arrangement originally approved by the Board in 1971, and will enable BHCF to have a facility, the Greentree Training Facility, large enough to continue the necessary educational and counseling services its residents require. Arguably, this Petition does not represent an expansion or enlargement at all since the number of residents will remain the same and the educational and counseling services will continue, albeit at a more centralized, better facility. In which case, no waiver is even required.

The Home went on to ask that, if the Board did construe the requested modifications to be expansions, the Home be granted a waiver from a requirement that the property have direct access to a public road built to arterial or higher standards.

A hearing was held in July of 1995, and testimony was presented by both proponents and opponents of the proposal. In September of 1995, the Board issued an opinion by which it granted the Home's requested modifications. Pierce appealed to the circuit court, and Montgomery County requested and was granted permission to intervene as an appellee. After reviewing the record before the Board and hearing argument by the parties, the court affirmed the Board's order. This appeal followed.

## Discussion

Section 59–G–1.3(c) of the Montgomery County Code provides that "[t]he Board [of Appeals] is authorized to amend or modify the terms or conditions of a special exception upon the request of the special exception holder...." The section further provides:

(1) If the proposed modification is such that the terms and/or conditions could be modified without substantially changing the nature, character or intensity of the use and

without substantially changing the effect on traffic or on the immediate neighborhood, the board, without the necessity of convening a public hearing to consider the proposed change, may modify such term or condition. . . .

(2) If the proposed modification would alter the terms and/or conditions of the special exception in such manner as to substantially change the nature, character or intensity of use of the original grant, would result in the extension, expansion or alteration of the size, location or appearance of the structure, or would intensify the impact on traffic or on the immediate neighborhood, the board shall convene a public hearing to consider the proposed modification. . . .

. . .

(4) The public hearing shall be limited to consideration of the proposed modifications noted in the board's notice of public hearing and to discussion of those aspects of the special exception use that are directly related to those proposals.

(5) After the close of the record of the proceedings, the board shall make a determination on the issues presented. The board may reaffirm, amend, add to, delete or modify the existing terms and/or conditions of the special exception. . . .

Section 59–G–2.21(g) of the Code directs:

A charitable or philanthropic institution for which a petition was approved prior to August 14, 1988, is not a nonconforming use. Such special exception may be amended in accordance with the modification provisions of Section 59–G–1.3(c), subject to the following provisions:

(1) Any expansion or enlargement must comply with the standards specified in paragraph[ ] (a) . . . above . . .

. . .

Section 59–G–2.21(a) reads, in pertinent part, as follows:

In . . . One–Family Residential Zones regulated by Section 59–C–1.32, the development standards are as follows:

(1) Minimum lot size: twice the minimum required by section ... 59–C–1.32....

...

(3) Minimum side yard setback: twice the minimum required by Section ... 59–C–1.32....

(4) Minimum frontage: twice the minimum required by section ... 59–C–1.32....

(5) Minimum green area: 50 percent.

(6) Maximum FAR: 0.2.

(7) Maximum lot coverage: half the maximum permitted by section ... 59–C–1.32....

(8) Maximum building height: as specified in section ... 59–C–1.32....

(9) *The property must front on and have direct access to a public road built to arterial or higher standards....*
(Emphasis added.)

In granting a modification to a special exception, as in making any other decision, the Board must expressly state its findings of fact and conclusions of law. Section 59–A–4.123 of the Montgomery County Code states: "All decisions of the board shall be taken by written resolution. Each resolution shall contain a statement of the grounds and findings forming the basis for such decisions...." In *Lee v. Maryland Nat'l Capital Park and Planning Comm'n,* 107 Md.App. 486, 492, 668 A.2d 980 (1995), *cert. denied,* 343 Md. 333, 681 A.2d 69 (1996), we explained:

A court reviewing the decision of an administrative agency is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." ... The standard of review thus depends upon the nature of the agency finding being reviewed.... First, the reviewing court must determine whether the agency interpreted and applied the correct principles of law governing the case and

no deference is given to a decision based solely on an error of law; the court may substitute its own judgment. . . . "In regards to findings of fact, the [reviewing] court cannot substitute its own judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record." . . .

(Citations omitted.) Contrasting the foregoing, the Court continued:

We must, in order to assess a *trial court's* ruling, apply a different test. . . . "While the 'clearly erroneous' standard applies to the court's findings of fact, the application of the law to the facts is judged on the abuse of discretion standard." . . . We must apply both standards: (1) the fairly debatable standard in assessing the trial court's findings in respect to the agency decision, and (2) the abuse of discretion standard in respect to the trial court's conclusions.

*County Comm'rs of Carroll County v. Zent,* 86 Md.App. 745, 752–53, 587 A.2d 1205 (1991) (emphasis in original; citations omitted).

 Whether a modification is an expansion within the meaning of § 59–G–2.21(g)(1) is a question of fact. *Cf. Wilson v. Mayor and Comm'rs of the Town of Elkton,* 35 Md.App. 417, 426, 371 A.2d 443 (1977) (explaining that the question of whether a nonconforming use has been expanded "is ordinarily one of fact, and in determining it the question in each case must stand on its own facts"). There is no suggestion in the zoning provisions of the Montgomery County Code that any expansion of a structure is to be considered an expansion under § 59–G–2.21(g)(1). Indeed, as we have observed, § 59–G–2.21(g)(1) states that a special exception "may be amended in accordance with the modification provisions of Section 59–G–1.3(c)," and that "[a]ny expansion or enlargement must comply with the standards specified in paragraph[ ] (a). . . ." Section 59–G–1.3(c)(2) requires that a public hearing be held "[i]f the proposed modification . . . would result in the extension, expansion or alteration of the size or appearance of the

structure...." The language of § 59–G–1.3(c)(2) is narrowly tailored to apply specifically to expansions or alterations of physical structures. Had the drafters intended § 59–G–2.21(g)(1) to apply to mere expansions or alterations of physical structures, they would have used identical or similar language. The language used in these two related provisions makes clear that the drafters recognized a difference between an "expansion or enlargement" *of the use of a property* and the mere "expansion or alteration *of the size or appearance of a structure.*" Sections 59–G–2.21(g)(1) and 59–G–1.3(c)(2) (emphasis added).

In granting the modification requested by the Baptist Home, the Board summarized the arguments presented by the Home and by the opponents. The Board found that "the proposed modification meets the general requirements for special exceptions as well as the specific requirements for a charitable or philanthropic institution set out in the zoning ordinance." It acknowledged, however, that

> [t]he underlying special exception was not the subject of the case. The only matters before the Board were the proposed new construction of a girls' dormitory, the expansion of what is now the boys' dorm into a training and recreation area, the renovation of the existing girls' dormitory into a boys' dormitory, the addition of seven parking spaces, and the incorporation into the special exception of the program to provide shelter for some adults as well as for children.

The Board then found:

> [T]he number of residents of the property, and the type of programs offered for those residents will not be changed by the proposed modification. In fact, the Board believes that the construction of a new dormitory, the renovation of an existing dormitory, and the expansion of a building to provide much-needed room for educational and recreational purposes, will only improve how the Baptist Home is able to carry out its two-pronged mission.

The Board went on to describe various steps that would be taken by the Home to reduce noise, improve aesthetics, and to otherwise allay the concerns of nearby residents.

Upon Pierce's appeal, the trial court affirmed the Board's order and stated:

The Court finds that the findings made by the Board are supported by substantial evidence in the record. Pursuant to section 59–G–1.3(4) of the Zoning Code, when considering a modification of a special exception, the Board is limited to the proposed modification and those aspects of the special exception that are related to the proposed modification. The Board recognized that the underlying special exception was not the subject of the case, and it only considered the proposed modifications. The opinion of the Board addressed the concerns raised about the proposed modifications rather than the concerns raised about the 1971 special exception.

As to Pierce's specific contention that the Board failed to make a finding as to whether the modification would amount to an expansion, and therefore failed to recognize that the arterial road requirement prohibited the modification, the court opined:

The Board found that the modifications would not increase the number of residents on the property and would not change the types of programs offered by the Baptist Home.

The Court finds that the Board addressed and made factual findings related to the Petitioner's claim that the Baptist Home did not comply with the arterial road requirement in section 59–G–2.21(g)(1) of the Zoning Code. The Board found that there would not be an increase in the number of residents or staff of the Baptist Home. Thus, the Board found that there was not an expansion or enlargement of the special exception to trigger the arterial road requirement.

■ As Pierce now points out, the Board did not specifically state in its order whether the modification would amount to an

expansion and did not specifically mention the arterial road requirement. The better practice would indeed have been expressly to address those matters. We agree with the trial court, however, that the Board's order reflected that the Board determined that the modification would not amount to an expansion of the use of the property under § 59–G–2.21(g)(1), and that the arterial road requirement was therefore inapplicable.

The Board made clear that the physical changes to be made to the Home—the construction of a new girls' dormitory, the renovations and addition to the old girls' dormitory, and the addition of seven parking spaces—would not affect the use of the property. As we have observed, the Board found that the number of residents would not increase and the types of programs provided would not change. Although not mentioned by the Board, it is significant to note that, although seven new parking spaces were being created, there is no suggestion in the record that the spaces are intended to fill anything more than an already existing need. As the Board opined, new construction "will only improve how the Baptist Home is able to carry out its two-pronged mission." Thus we, like the trial court, are satisfied that there was substantial evidence in the record that the physical improvements to the Home would not amount to an expansion of the use. *Cf. Feldstein v. LaVale Zoning Board,* 246 Md. 204, 211, 227 A.2d 731 (1967) (explaining, in the context of a nonconforming use, that a change in the use of property will be viewed as an expansion while an increase in the same use may merely be an intensification); Stanley D. Abrams, *Guide to Maryland Zoning Decisions* § 11.4 at 380–81 (3d ed.1992).

We acknowledge the Board's use of the word "expansion" throughout its order when referring to the proposed construction. Based on the aforementioned express statements of the Board, we are convinced that the Board merely used the word as a convenient short-hand for the "expansion or alteration of the size, location or appearance of the structure," as referenced in § 59–G–1.3(c)(2) of the Code, and did not mean to

suggest that the use of the specially excepted property was being expanded, as referenced in § 59–G–2.21(g)(1).

The Board expressly recognized in its order that "both adults and children are served by and reside at the facility. . . ." Despite Pierce's suggestions to the contrary, that finding did not compel a further finding that the use of the property had been expanded. In *Kastendike v. Baltimore Assoc. for Retarded Children, Inc.*, 267 Md. 389, 398, 297 A.2d 745 (1972), it was argued that the owners of a nursing home for elderly and alcoholic persons expanded the property's nonconforming use when they began accepting mentally retarded adults. The zoning board rejected a challenge to the nursing home's new practice and the Court of Appeals affirmed. The Court explained: "[W]e conclude that the similarities between the various uses of the premises as a nursing home are greater than the differences and the changes, if any, in the type of patients cared for are inconsequential." *Id.* at 398, 297 A.2d 745. *See also Parr v. Bradyhouse*, 177 Md. 245, 247, 9 A.2d 751 (1939) (rejecting a contention that an expansion occurred when the owner of dairy business converted the property, which was a nonconforming use, into a riding academy). Thus, as the trial court explained, the Board properly concluded that the proposed modifications would not effect an expansion within the meaning of § 59–G–2.21(g)(1), and that the arterial road requirement was therefore not applicable.

As a final matter, we briefly address appellant's suggestion that the Board's opinion was somehow deficient because it failed to set forth specific findings as to whether the proposed modification would comply with § 59–G–1.21. That section establishes the general conditions for granting a special exception. As both the Board and the trial court made clear, the Baptist Home's petition involved a proposed modification to a special exception and not the grant of a special exception itself. Section 59–G–1.21 was therefore inapplicable. By making express findings as to some of the requirements of the section, the Board did more than was required.

534

ORDER OF THE CIRCUIT COURT FOR MONTGOM-ERY COUNTY AFFIRMED; APPELLANT TO PAY THE COSTS.