763 A.2d 1217

**Mary Pat MARZULLO, et al.**

**v.**

**Peter A. KAHL.**

**No. 2301, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Dec. 26, 2000.

Carole S. Demilio (Peter Max Zimmerman, on the brief), Towson, for People's Counsel.

J. Carroll Holzer (Holzer & Lee, on the brief), Towson, for Marzullo.

Michael J. Moran, Towson, and John B. Gontrum and Romadka, Gontrum & McLaughlin, P.A., on the brief, Baltimore, for appellee.

Argued before EYLER, ROBERT L. KARWACKI (Ret., specially assigned), and ROBERT F. FISCHER (Ret., specially assigned), JJ.

ROBERT F. FISCHER, Judge (Retired, specially assigned).

This is an appeal by Mary Pat Marzullo and People's Counsel for Baltimore County, appellants, from a decision by the Circuit Court for Baltimore County reversing the County

Board of Appeals (Board) in a zoning matter. The circuit court held as a matter of law that a facility for the breeding, raising, and marketing of snakes, owned by Peter Kahl, appellee, was a farm within the meaning of the "RC–4", "Resource Conservation—Watershed Protection" zone.

## I. *Factual Background*

The underlying facts are not in dispute. Appellee is an avid snake lover and successful breeder of exotic pythons and boas. At first, appellee mated his reptiles in the basement of his home. Desiring to house his snakes in less constricted quarters, appellee built a facility on his Baltimore County property to breed, raise, and market snakes and transformed what began as a hobby into a business.[1] This case arose when some of his neighbors, including Ms. Marzullo, recoiled at the facility's inhabitants.

Appellee's business, Kahl Reptiles, Incorporated, is advertised on the Internet and "conducted on an extensive international basis." Appellee has one full-time employee, Marc Spataro, who testified before the Board and has had several articles published in scientific magazines and journals that are dedicated to the study and breeding of snakes. Both individuals were considered by the Board as "experts in the field of herpetology." Appellee also has co-authored articles and testified extensively regarding the "selectivity of the breeding ... the mating process, conditions required throughout the entire process, the harvesting of eggs, the incubation process, developmental stages, and the final determination of which snakes would be trained and which would ultimately be marketed."

Appellee markets to other breeders, individuals, and institutions. While there is a market for both human consumption and manufacturing, appellee avoids selling for these purposes, except for inexpensive, subpar animals. The snakes are bred

---

1. Appellee testified that his snake breeding business generates an annual gross income of approximately $500,000.

for color, pattern characteristics, and temperament. Appellee retains a significant portion of the snakes for breeding purposes. To attain these goals, appellee maintains extensive records and files on the snakes. Appellee also testified that he does not board or keep any animals for others at his facility. The Board noted that appellee's "expertise has resulted in the development of many varied strains of both Boas and Pythons relative to color and stripes and temperament."

Appellee's building is a two-level, ten thousand square foot, barn-like structure. The snakes are housed on the first floor, comprised of sixteen rooms, one of which is appellee's office. Installed in the building is an elaborate heating, cooling and ventilation system and each room is equipped with a sink, window, and radiant floor heat. The rooms are temperature controlled for optimal breeding, hatching, and growing conditions. In addition to the ordinary safety measures of locks and fire alarms, appellee's facility contains extraordinary safety measures, including an alarm system in the incubation room set to monitor the temperature and a security system that requires all the snakes' cage doors and doors to the facility to be locked before the alarm can be set or the door locked.

The snakes are normally maintained inside the facility, but they are taken outside for exercise and "sunning." Appellee also testified that the best breeding results require the females to exercise in order to maintain good muscle tone.

The barn is served by its own well and septic system that guarantees the snakes are hydrated and their cages cleansed with clean water. A compost system breaks down the snakes' waste and is used to fertilize the yard. Within the facility, appellee breeds rats and rat pups that are used to feed the snakes.

Despite the snakes' outside exercise, the Board did not find that the snakes pose any threat to the community. In fact, the Board found that this case "is not a situation of community safety, increased traffic, [or] snake security...." The Board further found that "testimony is uncontradicted that Kahl 'raises, breeds, keeps and markets' these animals (snakes)."

## II. *Procedural History*

Appellee's residence and snake breeding and raising facility are located on 4.72 acres, zoned "RC–4" or "Resource Conservation—Watershed Protection." The primary purpose of RC–4 zoning is to protect water supplies by controlling development in watershed areas. Baltimore County Zoning Regulations (BCZR) § 1A03.1 (2000).

In July 1994, appellee applied to the Baltimore County Department of Permits and Licenses for a "Holding Facility/Kennel/Wild Life" animal license for his reptile barn. This one-year license was issued on July 12, 1994.

Later in July 1994, appellee contacted Mr. Arnold Jablon, Director of the Department of Permits and Development Management, to present a plan for a barn-like structure to house snakes.[2]

On April 5, 1995, two months prior to the expiration of his animal license, he requested a "farm qualification" for his property from the Baltimore County Agricultural Land Preservation Advisory Board (Advisory Board). Attached to appellee's application was a map and parcel reference. Upon receiving appellee's request, Mr. Jablon requested Mr. Wallace Lippincott, program administrator of the agricultural preservation program, to verify the legitimacy of appellee's "farm qualification" request. At the Advisory Board's April 12, 1995 meeting, the "farm usage was approved and verified to Mr. Jablon by the Bureau." The Board, in its opinion, noted that the "farm qualification" request from Mr. Jablon stated:

This office is officially requesting verification of the legitimacy of a farm use on the referenced property. In the judgment of the Director and/or the Zoning Commissioner, in consideration of your findings, a special hearing may be

---

**2.** At the time Mr. Kahl proposed his business plan, the Department of Permits and Development Management was known as the Department of Zoning and Development Management. Mr. Jablon has remained as director throughout and his duties as such have not been altered. *See* BCZR §§ 5–1 to 5–2 (2000).

required before the Zoning Commissioner prior to any zoning approvals. We are submitting a copy of. . . .

In November 1996, appellee, pursuant to section 26–171(a)(7) of the Baltimore County Code, requested a limited exemption from the requirements of the building regulations. This request was granted by the Development Review Committee, Department of Permits and Development Management, by a letter from Mr. Jablon dated November 26, 1996. By virtue of this provision, appellee was exempted from both the community input meeting and the public hearing.

Appellee's first building permit was issued on February 14, 1997. Because appellee decided to add a basement to his facility, he re-applied and was issued a new permit on March 27, 1997, allowing for a 10,000 square foot facility.[3]

On April 16, 1997, Mr. Carl Richards, Supervisor of Baltimore County's Zoning Review Section, wrote appellee a letter informing him that there had been community complaints about his proposed usage for the barn. Mr. Richards pointed out that any citizen could file a petition for special hearing. Section 500.7 of the zoning regulations explains by whom and for what a petition for special hearing can be requested. It permits:

> any interested person to petition the zoning commissioner for a public hearing after advertisement and notice to determine the existence of any purported nonconforming use on any premises or to determine any rights whatsoever of such person in any property in Baltimore County insofar as they are affected by these regulations.

BCZR § 500.7 (2000). In that same letter, however, Mr. Richards stated that his department accepted the Advisory Board's recommendation that appellee's property was a

---

**3.** The original application stated that the facility would have a private water and sewage system, but the permit stated that the property would be fed by the public water and sewage system. The Board found that this discrepancy was merely an administrative error that was not "germane to the case."

"farm" at face value and deferred to the Advisory Board's expertise and knowledge about the subject matter.

Ms. Marzullo filed a Petition for Special Hearing near the end of April 1997, arguing that appellee's facility was not a "farm" and thus not a permitted use in a RC–4 zone. Appellee was notified that appellants' petition had been filed on April 30, 1997. The Board found that at the time of the petition's filing, the reptile barn was 45% complete with its foundation laid and walls erected.

The zoning commissioner heard the case on October 21, 1997, and denying appellant's petition, approved the site for the breeding, raising, and selling of reptiles.

On November 30, 1998, seeking a modern-day Phorbas,[4] appellants appealed to the Board. The Board reversed and held that the snake facility was not a use permitted as of right in a RC–4 zoning district.

Appellee then petitioned for judicial review of the Board's ruling to the circuit court. On November 16, 1999, the circuit court reversed the Board and held that the snake breeding facility was a farming activity permitted as of right. An appeal from the Circuit Court's decision was timely filed to this court.

III. *Applicable Standard of Review*

Our review of an administrative agency's decision is narrow. *Board of Physician Quality Assur. v. Banks*, 354 Md. 59, 67, 729 A.2d 376 (1999). We will not disturb the agency's factual findings unless those findings are clearly erroneous. *Pierce v. Montgomery County*, 116 Md.App. 522, 529, 698 A.2d 1127 (1997) (quoting *County Comm'rs of Carroll County v. Zent*, 86 Md.App. 745, 752–53, 587 A.2d 1205 (1991)). In other words, we will not substitute our judgment for an agency's factual findings if the record contains substantial

---

4. Phorbas, who hailed from the Ancient Greek region of Thessaly, was asked by the people of Rhodos to free them from the snakes that were plaguing their island. Upon doing so, he was heralded as a hero.

evidence to support them. *Banks,* 354 Md. at 67, 729 A.2d 376. We review whether an agency correctly applied the facts to the law to determine if it abused its discretion. *Pierce,* 116 Md.App. at 529, 698 A.2d 1127. In evaluating whether an abuse of discretion occurred, "we accord great deference to the agency and ask merely whether a reasoning mind could reasonably have reached the conclusion reached by the agency." *Sterling Homes Corp. v. Anne Arundel County,* 116 Md.App. 206, 216–17, 695 A.2d 1238 (1997)(quoting *Evans v. Shore Communs.,* 112 Md.App. 284, 299, 685 A.2d 454 (1996)). An agency's legal conclusions, however, will be reviewed *de novo. Maryland State Dept. of Educ. v. Shoop,* 119 Md.App. 181, 197, 704 A.2d 499, *cert. denied* 349 Md. 495, 709 A.2d 140 (1998).

██ Questions of statutory construction and interpretation are questions of law. *See Enviro–Gro Technologies v. Bockelmann,* 88 Md.App. 323, 329, 594 A.2d 1190, *cert. denied* 325 Md. 94, 599 A.2d 447 (1991) (quoting *Harford County v. McDonough,* 74 Md.App. 119, 122, 536 A.2d 724 (1988) ("The order of an administrative agency, such as a county zoning board, must be upheld on review if it is not premised upon an error of law. . . .")). Our cases have long held that a reviewing court is not bound by the agency's interpretation of statutes. *See Department of Human Resources v. Thompson,* 103 Md.App. 175, 190, 652 A.2d 1183 (1995). When the facts are not disputed, we will review the agency's decision to determine that it is not based upon an erroneous conclusion of law. *Banks,* 354 Md. at 67–68, 729 A.2d 376.

In this case, all parties agree that appellee uses his snake breeding facility to breed, grow, and sell exotic boas and pythons. The question is whether this use meets the definition of "farm" as used in the Baltimore County Zoning Regulations. BCZR § 101 (2000).

## IV. *Applicable Rules of Statutory Construction*

██ Long-standing canons of statutory interpretation mandate that we interpret a statute's words using their plain

meaning. *See Thompson,* 103 Md.App. at 200, 652 A.2d 1183 (citing *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753 (1993)). And "where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself." *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999); *see Marriott Employees Fed. Credit Union v. MVA,* 346 Md. 437, 444, 697 A.2d 455 (1997); *see also Lone v. Montgomery County,* 85 Md.App. 477, 502, 584 A.2d 142 (1991). When statutory terms are free from ambiguity, we assign them a plain and sensible usage. *Tidewater/Havre de Grace, Inc. v. Mayor & City Council of Havre de Grace,* 337 Md. 338, 345, 653 A.2d 468 (1995)("we are not ... at liberty to create an ambiguity where none otherwise exists ....") (citations omitted). Finally, we "give every word effect, avoiding constructions that render any portion of the language superfluous or redundant." *Rouse–Fairwood Ltd. v. Supervisor of Assessments,* 120 Md.App. 667, 687, 708 A.2d 19 (1998) (citing *Blondell v. Baltimore City Police Dep't,* 341 Md. 680, 691, 672 A.2d 639 (1996)).

On the other hand, when the plain meaning of a statute is unclear, "courts should consider not only the literal or usual meaning of the statutory language, but also its 'meaning and effect in light of the setting, the objectives and purpose of the enactment.'" *Rouse–Fairwood,* 120 Md.App. at 688, 708 A.2d 19 (quoting *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986)). We look to the statutory scheme in which those words appear to ascertain their meaning. *See Edgewater,* 349 Md. at 808, 709 A.2d 1301. In evaluating the statutory scheme, the provision's policies and purposes are evaluated in order to ascertain the legislative body's intent. *See Porter,* 349 Md. at 617, 709 A.2d 1205. That said, however, we still avoid "giving the statute a strained interpretation or one that reaches an absurd result." *Metheny v. State,* 359 Md. 576, 610, 755 A.2d 1088 (2000) (citing *Huffman v. State,* 356 Md. 622, 627–28, 741 A.2d 1088 (1999)); *see, e.g., Thanos v. State,* 332 Md. 511, 525, 632 A.2d 768 (1993). We can never "embellish a statutory provision so

as to enlarge its meaning." *Abington Ctr. Assocs. Ltd. v. Baltimore County,* 115 Md.App. 580, 603, 694 A.2.\ 165 (1997).

V. *Discussion*

 The Baltimore County Zoning Regulations delineate uses permitted as of right and by special exception in section 1A03.3(A) and (B), respectively. BCZR § 1A03. Appellee argues that the snake breeding and raising facility is a use permitted as of right under section 1A03.3(A)(2), which entitles one in a RC–4 zone to use property as a farm. BCZR § 1A03.3(A)(2). "Farm" is defined by the zoning regulations as,

> Three acres or more of land, and any improvements thereon, used primarily for commercial agriculture, as defined in these regulations, or for residential and associated agricultural uses. The term does not include the following uses as defined in these regulations: limited-acreage wholesale flower farms, riding stables, landscape service, firewood operations and horticultural nursery businesses.

BCZR § 101. The zoning regulations, also in section 101, define "commercial agriculture":

> The use of land, including ancillary structures and buildings, to cultivate plants or raise or keep animals for income, provided that the land also qualifies for farm or agricultural use assessment pursuant to Section 8–209 of the Tax–Property Article of the Annotated Code of Maryland, as amended. Commercial agriculture includes the production of field crops, dairying, pasturage agriculture, horticulture, floriculture, aquaculture, apiculture, viticulture, forestry, animal and poultry husbandry, horse breeding and horse training and also includes ancillary activities such as processing, packing, storing, financing, managing, marketing or distributing, provided that any such activity shall be secondary to the principal agricultural operations.

*Id.* Because "animal" is not defined in section 101, the zoning regulations assign it the definition as stated in the most recent edition of the *Webster's Third New International Dictionary.*

*Id.* *Webster's* defines "animal" as, "... being characterized by a requirement for complex organic nutrients including proteins or their constituents which are usually digested in an internal cavity before assimilation into the body proper...." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 85 (1961).

Appellants argue that the Board properly found as a fact that appellee's facility was not a farm, and thus, we should review its finding for an abuse of discretion. We disagree.

The Board interpreted the BCZR's language and based its conclusion on that interpretation. The Board attempted to determine the intention of the legislative body and in doing so, considered expert testimony and the entire statutory scheme. The Board quoted from *Porter v. Bayliner Marine Corp.,* 349 Md. 609, 617, 709 A.2d 1205 (1998)("When interpreting any statute, we must look to the entire statutory scheme, and not any one provision in isolation to affect the statute's general policies and purposes. When the statute to be construed is part of the statutory scheme, the legislative intent is determined by considering it in light of the statutory scheme."); and *Edgewater Liquors, Inc. v. Liston,* 349 Md. 803, 808, 709 A.2d 1301 (1998) ("... the meaning of the plainest language is controlled by the context in which it appears ... In analyzing a statute, we approach statutory construction from a common sense perspective ... Accordingly, we avoid construing a statute so as to lead to results that are unreasonable, illegal, or inconsistent with common sense."). The Board determined that appellee's use was not a farm because it did not involve the "use of land" and it was not "animal husbandry." The Board explained that, while land may have been used in a technical sense, it was not being used in an agricultural sense. With respect to animal husbandry, the Board looked to the dictionary, concluded that it was limited to domestic animals and that snakes were not domestic.

Appellants rely on *Enviro–Gro Technologies v. Bockelmann,* 88 Md.App. 323, 594 A.2d 1190 (1991), to support their position that the Board's determination was properly a factual one. This reliance is faulty. *Enviro–Gro* involved sludge that

was ultimately to be used for agricultural purposes. The zoning authority had to decide at what point the sludge metamorphosized into an agricultural product. The case at bar is distinguishable. Whether one believes that a snake paved the way for the Golden Reign of Augustus, or felled Adam and Eve from the Garden of Eden, there is no question that a snake is an animal.[5] There is also no dispute as to the underlying facts. In this case, the only question is whether appellee's snakes live on a "farm" as defined by the BCZR.

Appellee testified that he suns and exercises his animals outside. He composts their waste and spreads it over his land. The breeding facility is supported by the land and is hydrated from the well on the land. It is difficult to draw a distinction between this use of the land and other modern farm uses.

The Board determined that the legislative body intended to limit "the use of land" to uses that produced food or fiber. This conclusion was in error because the Board superimposed the definition of "farm animal" found in Baltimore County Code (BCC), Article I, section 6–1 (1991), onto the legislature's choice of the more general word, "animal." BCC Article I, section 6–1 defines "farm animal" as "[a]ny animal being maintained for the production of food, food products, and fiber." However, the "commercial agriculture" definition only requires that the land be used to "raise or keep animals for income." BCZR § 101.

In several places, the Board reasoned that appellee's use was not a "farm" within the BCZR's meaning because "there is no crop, growth, production or animal raised primarily *for food or fiber.*" (Emphasis added). To arrive at this deduction, the Board relied on appellant's expert witnesses. This reliance was misplaced, however, because that testimony

---

**5.** After losing the Battle of Actium in 31 BC, Cleopatra committed suicide, in order to save herself the humiliation of being led by Augustus through the streets of Rome, by sneaking an asp into her tower and letting it bite her. Plutarch, *Lives.* The Bible tells how the serpent coerced Eve into biting the apple, causing Adam's and Eve's subsequent fall from Eden. 3 Genesis 14.

merely sought to define a term that was unambiguous. *See Tidewater,* 337 Md. at 345, 653 A.2d 468. Moreover, it is telling that the legislative body could have used "farm animal" in the definition or replace "income" with "production of food, food products, and fiber" and declined to do so. *See* BCC Art. I, § 6–1.

Appellee does what the definition of "commercial agriculture" requires—he breeds and raises snakes and then sells most of them for profit, except for the ones that he keeps for future breeding. The zoning ordinance defines "farm" and "commercial agriculture." Consequently, there is no need to go to the dictionary's definition of the terms.

The Board also relied on the Baltimore County Planning Board's Report, dated October 17, 1991, for the proposition that the Baltimore County Council intended a limited "farm" definition. We disagree. The first line of the Report, as referenced by the Board's opinion, states, "The principal that sets agricultural uses apart is that land *or structures and buildings* are utilized to produce plants *or raise animals for income.*" (Emphasis added). The BCZR's definition of "commercial agriculture" mirrors this language. *See* BCZR § 101. Neither limit "animal" to a specific type and both simply require the animals to produce income.[6] No production of food or food products is required.

When we apply the undisputed facts to the plain language of the ordinance and its statutory context, we conclude that appellee's facility is a farm as a matter of law. This conclusion is based on the fact that snakes are animals as defined by the ordinance and land is being used. Consequently, we have no need to address the definition of animal husbandry or whether appellee's use falls within the definition of the uses permitted in other zones.

We note, however, that the Board also concluded that appellee's facility was a "pet shop" and a permitted use in certain zones. It is difficult to square how snakes can be

---

6. The Board found that it was undisputed that snakes were "animals."

"pets" within the definition of "pet shop," but not domestic for purposes of animal husbandry. *See* BCZR § 101 ("PET SHOP—a store for the sale of dogs, cats, birds, tropical fish and/or other domesticated pets . . . ."); *cf.* E. 36–37 (". . . the Board concludes that in ordinary parlance as well as by the dictionary the word 'domestic' means relating to the home or household . . . This Board, while recognizing Mr. Kahl's efforts to breed snakes as domesticated, does not agree that they fit the definition . . . .").

The Board also concluded that appellee's use was an "animal boarding place" permitted in certain zones. An animal boarding place involves "boarding, breeding and care of animals for profit, but excluding a farm, kennel, pet shop, veterinarian's office or veternarium." BCZR § 101. This definition does not include raising and keeping animals, but the farm definition does. There is no dispute about the fact that appellee raised and kept animals. The BCZR's definition of "animal boarding place" indicates that it is a more limited facility than a farm.

■■ Section 101 of the Baltimore County Zoning Regulations also requires appellee's farm to qualify for the agricultural use assessment tax, pursuant to section 8–209 of the Tax–Property Article of the Maryland Annotated Code. BCZR § 101. It does not require appellee to have his land assessed agricultural, which is optional to a landowner. The Board found that because appellee's property was zoned "residential," he did not meet this part of the definition. This conclusion was in error.

The statute does not exclude property that is zoned as residential from being "commercial agriculture." BCZR section 101 only requires that the property "qualifies" for the agricultural use assessment. BCZR § 101. There are many reasons why a property owner may chose not to apply for the agricultural use assessment. First, a landowner may be subjected to certain tax penalties. *See* State Department of Assessment and Taxation, Real Property, *The Agricultural Use Assessment,* (Sept. 23, 2000)

<http://www.dat.state.md.us> ("Because certain risks in the form of potential tax penalties can result from receiving the agricultural use assessment, the property owner should carefully evaluate the actual tax savings against those risks."). Second, property assessed in the Agricultural Use category could be subjected to Agricultural Transfer Taxes upon transfer or other disposition of the land. *See id.* It is clearly not mandatory, therefore, to have one's land assessed as "agricultural use" in order to farm it. Rather, BCZR section 101 looks to the Tax–Property Article section 8–209 for additional guidance in determining if a land is being used for agricultural use.

Because the Board incorrectly understood this portion of section 101's definition and did not rely on any other evidence in making its determination, we remand this case back to the Board in order to determine whether appellee's land would qualify for the agricultural land use assessment, if he were to apply for it.

In conclusion, we hold that appellee's snake facility is a place that uses the land to breed and raise animals for income, pursuant to the plain language of BCZR section 101. On remand, the Board must decide if appellee would qualify for the agricultural use assessment pursuant to section 8–209 of the Tax–Property Article, if appellee were to apply. Only then can it be determined whether appellee is operating a "farm" permitted in an RC–4 zone.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH DIRECTIONS TO REMAND TO THE BALTIMORE COUNTY BOARD OF APPEALS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO ABIDE THE RESULT.**

KARWACKI, Judge, Dissenting.

I respectfully dissent.

The Board of Appeals considered the evidence in this case and inferences properly drawn therefrom, and after applying the applicable definitions of the Baltimore County Zoning

Regulations concluded that the appellee's snake breeding and raising facility did not meet the definition of a "farm" permitted in the R.C. 4 zone. The Board's resolution of this issue, dependent to some degree upon its expertise in applying Baltimore County Zoning Regulations, is entitled to deference. As the Court of Appeals explained in *Board of Physician v. Banks*, 354 Md. 59, 67–69, 729 A.2d 376 (1999):

A Court's role in reviewing an administrative agency adjudicatory decision is narrow. (Citations omitted). It is limited to determining if there is substantial evidence in the record as a whole to support the agency's finding and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law. [Citations omitted.]

In applying the substantial evidence test, a reviewing court decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. [Citations omitted.] A reviewing court should defer to the agency's fact finding and drawing of inferences if they are supported by the record. [Citations omitted.] A reviewing court must review the agency's decision in the light most favorable to it; ... The agency's decision is *prima facie* correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence [Citations omitted] ... (Final agency decisions "are *prima facie correct and carry with them the presumption of validity.")*

Despite some unfortunate language that has crept into a few of our opinions (fn.1), a court's task on review is *not* to "substitute its judgment for the expertise of those persons who constitute the administrative agency." [Citations omitted]. **Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.** [Citations omitted.] **(The interpretation of a statute by those officials charged**

with administering the statute is ... entitled to weight.) [Emphasis added.] Furthermore, the expertise of the agency in its own field should be respected. [Citations omitted.]

I would reverse the judgment below with instruction to affirm the decision of the Board of Appeals.